UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATURAL RESOURCES DEFENSE COUNCIL, INC.,

Plaintiff,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and ANDREW WHEELER, in his official capacity as Administrator of the Environmental Protection Agency,

Defendants.

19 Civ. 5174 (DLC)

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2721
Fax:  (212) 637-2686
Email: tomoko.onozawa@usdoj.gov

TOMOKO ONOZAWA
Assistant United States Attorney, *Of Counsel*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATUTORY AND FACTUAL BACKGROUND ........................................................... 3

I.      THE FEDERAL ADVISORY COMMITTEE ACT ........................................... 3

II.     EPA FEDERAL ADVISORY COMMITTEES .............................................. 4

III.    EPA GRANT PROGRAMS ............................................................................. 5

IV.     EPA ADVISORY COMMITTEE DIRECTIVE: "STRENGTHENING AND
        IMPROVING MEMBERSHIP ON EPA FEDERAL ADVISORY
        COMMITTEES" ................................................................................................. 5

STANDARD OF REVIEW ................................................................................................ 7

I.      RULE 12 MOTION TO DISMISS .................................................................. 7

II.     RULE 56 MOTION FOR SUMMARY JUDGMENT ..................................... 8

ARGUMENT ...................................................................................................................... 9

I.      NRDC'S APA CLAIMS FAIL FOR LACK OF A MEANINGFUL STANDARD
        FOR JUDICIAL REVIEW. ............................................................................. 9

        A.      Matters Committed to Agency Discretion by Law Are Not Reviewable .............. 9

        B.      NRDC Points to No Meaningful Standard for Review ......................................... 12

        C.      The Fair Balance Provision of FACA Is Nonjusticiable. ..................................... 16

        D.      The Inappropriate Influence Provision of FACA Is Nonjusticiable. ................... 18

II.     THE EPA DIRECTIVE HAS A RATIONAL BASIS AND IS NOT
        ARBITRARY OR CAPRICIOUS. .................................................................. 21

        A.      The APA's Arbitrary and Capricious Standard of Review ................................... 21

        B.      The Directive Constitutes a Reasonable Exercise of EPA's Highly
                Discretionary Authority to Manage Its Federal Advisory Committees. ............... 21

                1.      EPA Directive Section 1: Strengthen Member Independence ................. 23

                2.      EPA Directive Section 2: Increase State, Tribal and Local
                        Government Participation ...................................................................... 24

                3.      EPA Directive Section 3: Enhancing Geographic Diversity ................... 25

   4. EPA Directive Section 4: Promoting Fresh Perspectives. ........................ 26

 C. NRDC's Challenges to the Directive Are Meritless. ............................................ 26

   1. The Directive Is Neither Inconsistent with, Nor Prohibited by, Ethics Laws. ............................................................................................. 26

   2. The Directive Is Consistent with FACA ...................................................... 29

   3. EPA Will Continue to Appoint Highly Qualified Individuals to Its FACs ........................................................................................................... 29

   4. The Directive Is the Product of Reasoned Decision-Making. ................... 30

   5. The Directive Adequately Explained the Reasons for Its Adoption. ......... 31

III. NOTICE-AND-COMMENT RULEMAKING WAS NOT REQUIRED. ....................... 32

CONCLUSION. .................................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ................................................................................... 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................... 7

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*,
    968 F.2d 196 (2d Cir. 1992) ........................................................................ 7

*Bechtel v. Admin. Review Bd.*,
    710 F.3d 443 (2d Cir. 2013) ........................................................................ 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 7, 8

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) ................................................................................... 10

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667 (1986) ................................................................................... 10

*Brass v. Am. Film Techs., Inc.*,
    987 F.2d 142 (2d Cir. 1993) ........................................................................ 8

*Califano v. Sanders*,
    430 U.S. 99 (1977) ..................................................................................... 10

*Camp v. Pitts*,
    411 U.S. 138 (1973) ..................................................................................... 9

*Cargill, Inc. v. United States*,
    173 F.3d 323 (5th Cir. 1999) ..................................................................... 19

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ..................................................................................... 8

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ................................................................................... 33

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................................................ 10

*Claybrook v. Slater*,
  111 F.3d 904 (D.C. Cir. 1997) .......................................................................... 11

*Colorado Environmental Coalition v. Wenker*,
  353 F.3d 1221 (10th Cir. 2004) ........................................................................ 18

*Ctr. for Auto Safety v. Dole*,
  846 F.2d 1532 (D.C. Cir. 1988) ........................................................................ 11

*Ctr. for Policy Analysis on Trade & Health v. Office of U.S. Trade Representative*,
  540 F.3d 940 (9th Cir. 2008) ............................................................ 15, 17, 19

*Doe v. Shalala*,
  862 F. Supp. 1421 (D. Md. 1994) .................................................... 15, 16, 17

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) ............................................................................ 10

*EPA v. EME Homer City Generation, L.P.*,
  134 S. Ct. 1584 (2014) ...................................................................................... 24

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................................ 32

*Fertilizer Inst. v. U.S. EPA*,
  938 F. Supp. 52 (D.D.C. 1996) ........................................................ 16, 17, 20

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .................................................................................... passim

*Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*,
  482 U.S. 270 (1987) ............................................................................................ 12

*J. Andrew Lange, Inc. v. FAA*,
  208 F.3d 389 (2d Cir. 2000) ............................................................................... 8

*Just Bagels Mfg., Inc. v. Mayorkas*,
  900 F. Supp. 2d 363 (S.D.N.Y. 2012) ............................................................... 8

*Kappa Printing Group, LLC v. Archie Comic Publ'ns, Inc.*,
  No. 17 CV 7511, 2018 WL 2561032 (S.D.N.Y. June 4, 2018) ................................................. 7

*Karpova v. Snow*,
  402 F. Supp. 2d 459 (S.D.N.Y. 2005) ..................................................................................... 8

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State Bureau of Consular Affairs*,
  104 F.3d 1349 (D.C. Cir. 1997) ............................................................................................. 11

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ...................................................................................... 10, 12, 33

*Lunney v. United States*,
  319 F.3d 550 (2d Cir. 2003) .......................................................................................... 10, 14

*Mass. Public Interest Research Grp., Inc. v. U.S. Nuclear Regulatory Comm'n*,
  852 F.2d 9 (1st Cir 1988) ........................................................................................ 11

*Metcalf v. Nat'l Petrol. Council*,
  553 F.2d 176 (D.C. Cir. 1977) ........................................................................................ 17

*Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................... 9, 21, 22, 31

*Nat'l Anti-Hunger Coal. v. Exec. Comm. of the President's Private Sector Survey on Cost Control*,
  711 F.2d 1071 (D.C. Cir. 1983) ........................................................................................ 34

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ........................................................................................ 31

*Nat'l Fed'n of Fed. Emps. v. United States*,
  905 F.2d 400 (D.C. Cir. 1990) ........................................................................................ 12

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ........................................................................................ 33

*New York State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*,
  267 F.3d 128 (2d Cir. 2001) ........................................................................................ 33

*Noel v. Chapman*,
  508 F.2d 1023 (2d Cir. 1975) ........................................................................................ 33, 34

*NRDC v. Wheeler*,
   367 F. Supp. 3d 219 (S.D.N.Y. 2019) ............................................................................ 1

*Padula v. Webster*,
   822 F.2d 97 (D.C. Cir. 1987) ...................................................................................... 11

*Phifer v. City of New York*,
   289 F.3d 49 (2d Cir. 2002) ........................................................................................... 7

*Physicians for Social Responsibility v. Wheeler*,
   359 F. Supp. 3d 27 (D.D.C. 2019) ...................................................................... passim

*Pub. Citizen v. Dep't of Health & Human Servs.*,
   795 F. Supp. 1212 (D.D.C. 1992) ............................................................................. 17

*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*,
   886 F.2d 419 (D.C. Cir. 1989) ............................................................................ passim

*Pub. Citizen v. U.S. Dep't of Justice*,
   491 U.S. 440 (1989) ................................................................................................. 3, 6

*Steenholdt v. FAA*,
   314 F.3d 633 (D.C. Cir. 2003) ............................................................................ 11, 30

*Sweet v. Sheahan*,
   235 F.3d 80 (2d Cir. 2000) ......................................................................................... 33

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
   752 F.3d 239 (2d Cir. 2014) ........................................................................................ 7

*Union of Concerned Scientists v. Wheeler*,
   377 F. Supp. 3d 34 (D. Mass. 2019) .................................................................. passim

*Webster v. Doe*,
   486 U.S. 592 (1988) .............................................................................................. 10, 11

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) ................................................................................................. 10

**Statutes**

5 U.S.C. app. 2 § 6(c) ................................................................................................. 15

5 U.S.C. app. 2 § 3(2) ................................................................................................... 4

5 U.S.C. app. 2 § 5(b)(2) ........................................................................................... 14

5 U.S.C. app. 2 § 5(b)(3) ...................................................................................... 14, 27

5 U.S.C. app. 2 § 8(a) ............................................................................................ 4, 12

5 U.S.C. app. 2 § 10(a)(2) ............................................................................................ 3

5 U.S.C. app. 2 §§ 1–15 ....................................................................................... 3, 13

5 U.S.C. § 5(b)(2) ........................................................................................................ 6

5 U.S.C. § 553(b) ....................................................................................................... 32

5 U.S.C. § 553(b)(3)(A) ....................................................................................... 11, 30

5 U.S.C. § 701(a)(2) ................................................................................................... 30

5 U.S.C. § 706 ............................................................................................................... 9

5 U.S.C. § 706(2) .......................................................................................................... 8

5 U.S.C. § 702 ............................................................................................................... 9

7 U.S.C. § 136w(d)(1) .................................................................................................. 5

18 U.S.C. § 208 .......................................................................................................... 27

33 U.S.C. § 1251(b)(1) ............................................................................................... 24

42 U.S.C. § 7401(a)(3) ............................................................................................... 24

42 U.S.C. § 7403(b)(3) ................................................................................................. 5

42 U.S.C. § 7409(d)(2)(A) ............................................................................................ 5

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................................ 7

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 7, 8

Fed. R. Civ. P. 56(a) ............................................................................................................. 8

**Regulations**

5 C.F.R. § 2640.101 ........................................................................................................... 27

41 C.F.R. Pt. 102–3 ...................................................................................................... 4, 12

41 C.F.R. § 102-3.25 ............................................................................................................ 4

41 C.F.R. § 102-3.130(a) ................................................................................... 4, 12, 24, 34

**Other Authorities**

70 Fed. Reg. 2664 ............................................................................................................... 30

75 Fed. Reg. 35 ................................................................................................................... 23

161 Cong. Rec. H10161 ..................................................................................................... 28

## INTRODUCTION

Advisory committees further the mission of the United States Environmental Protection Agency ("EPA") by providing independent, expert advice on a range of environmental issues. EPA's Administrator is responsible for ensuring that EPA's federal advisory committees ("committees" or "FACs") are composed of knowledgeable, experienced, and qualified members, who also reflect the diverse viewpoints of the communities most affected by the statutes and programs that EPA administers.  To that end, in October 2017, EPA issued a Directive entitled, "Strengthening and Improving Membership on EPA Federal Advisory Committees."  *See* Complaint ("Compl.") Ex. A at 1, ECF No. 1-1 ("Directive").  That same day, EPA issued an accompanying memorandum providing additional explanation for the principles outlined in the Directive.  *Id.* at Ex. B, ECF No. 1-2.  The Directive announced four fundamental principles intended to strengthen committee member independence; increase state, tribal, and local government participation; enhance geographic diversity; and promote fresh perspectives on EPA's federal advisory committees.  To strengthen member independence, EPA determined that individuals currently receiving EPA grants generally should not also serve on EPA's committees, with the exception of state, tribal, or local government agency recipients of grants.  That policy determination is set forth in Section 1 of the Directive.

In its second attempt to challenge the Directive in this Court,[1] plaintiff Natural Resources Defense Council, Inc. ("NRDC") asserts that the EPA's effort to ensure a diversity of viewpoints

---

[1] The instant lawsuit is virtually identical to an APA challenge to the Directive which NRDC previously filed in this Court on January 24, 2018.  *See generally NRDC v. Wheeler*, 18 Civ. 613 (WHP).  By Opinion & Order filed in that case on March 21, 2019, Judge Pauley granted the Government's motion to dismiss for lack of subject matter jurisdiction, holding that NRDC had not established Article III standing, and dismissed NRDC's claims without prejudice.  *See NRDC v. Wheeler*, 367 F. Supp. 3d 219, 234 (S.D.N.Y. 2019).

on advisory committees that provide advice and recommendations to the Administrator is unlawful under the Administrative Procedure Act ("APA").  But NRDC's Complaint misses the jurisdictional mark, and should be dismissed.  NRDC's claims concern an EPA advisory committee member appointment policy, a matter committed to agency discretion by law and nonjusticiable under the APA.  The Federal Advisory Committee Act ("FACA") and its implementing regulations generally commit the appointment of members to the agency's sole discretion, and provide no justiciable standards for this Court to apply to NRDC's claims.  In light of that fundamental defect, two district courts that considered APA challenges to the Directive this year dismissed those lawsuits for precisely this lack of justiciable standards.  *See Physicians for Social Responsibility v. Wheeler*, 359 F. Supp. 3d 27 (D.D.C. 2019); *Union of Concerned Scientists v. Wheeler*, 377 F. Supp. 3d 34 (D. Mass. 2019).  This Court should do the same.

In the alternative, the Court should enter judgment for EPA because the Directive is a reasonable policy that easily meets the arbitrary and capricious standard of review.  As the Administrative Record in this case shows, the Directive was issued to address Congressional recommendations, stakeholder feedback, prior EPA policies, and principles of federalism underlying environmental laws—all of which supported changes in how EPA administered its 22 advisory committees.  Accordingly, the Directive adopts a four-tiered approach to strengthen and improve EPA's committees and ensure that those committees operate in accord with FACA.

Although NRDC focuses only on the Directive's discussion of EPA grant-recipients' service on committees, the other three initiatives contained in the Directive and accompanying Memorandum provide important context for Section 1 of the Directive.  Sections 2 through 4 of the Directive reflect the agency's goal of promoting new and different perspectives on EPA's

advisory committees by ensuring the regular rotation of members; increasing state, tribal, and local government participation; and enhancing geographic diversity of membership.  The Directive as a whole, therefore, offers a transparent look at EPA's policy priorities with respect to how it intends to use its appointment power to bring greater independence, balance, and diversity—geographic and otherwise—to these important committees.  And it does so with a clear explanation of its rationale, showing that the agency engaged in reasoned decision making.  The APA requires no more and NRDC's policy disagreement with the agency provides no basis to prevail on its challenge.  Finally, because the Directive is only a statement of policy regarding how EPA intends to exercise its EPA's committee appointment power, NRDC's claim that the APA required notice and comment rulemaking here is meritless.

## STATUTORY AND FACTUAL BACKGROUND

## I.      THE FEDERAL ADVISORY COMMITTEE ACT

Congress enacted FACA, 5 U.S.C. app. 2 §§ 1–15, to reduce the growing cost of unnecessary blue-ribbon commissions, advisory panels, and honorary boards set up by the government to advise the President and federal agencies.  *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446 (1989) (citing 5 U.S.C. app. 2 § 2(b)).  To achieve these goals, FACA imposes an array of procedural requirements.  Advisory committees subject to FACA must give advance notice in the Federal Register of any meetings, 5 U.S.C. app. 2 § 10(a)(2); hold their meetings "open to the public," *id.* § 10(a)(1); and make their records available to the public, *id.* § 10(b).  FACA requires that each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3); *see also* § 5(c).

Federal advisory committees exist to provide expert, collective "advice or recommendations" to the President or an agency on matters relevant to their responsibilities. 5 U.S.C. app. 2 § 3(2); *see also* 41 C.F.R. § 102-3.25. FACA itself is silent as to the qualifications of committee members and as to what policies an agency may establish with regard to member selection and retention. Indeed, FACA vests agency heads with the responsibility to establish "uniform administrative guidelines and management controls" to govern their advisory committees. 5 U.S.C. app. 2 § 8(a).[2] And the U.S. General Services Administration's ("GSA") regulations implementing FACA provide that, absent a relevant legal authority prescribing otherwise, "[m]embership terms are at the sole discretion of the appointing or inviting authority" and "committee members serve at the pleasure of" that authority. 41 C.F.R. § 102-3.130(a).

## II.   EPA FEDERAL ADVISORY COMMITTEES

EPA currently manages 22 advisory committees, addressing a wide range of environmental and human health subjects relevant to EPA's mission. *See generally* "All Federal Advisory Committees at EPA," *available at* https://www.epa.gov/faca/all-federal-advisory-committees-epa/ (last updated Aug. 6, 2019). Of these 22 committees, eight are established by statute, including two committees referenced in NRDC's Complaint, the Clean Air Scientific Advisory Committee ("CASAC") and the Science Advisory Board ("SAB"). *See* Compl. ¶ 23.

Some statutes establishing advisory committees require that the committee has a specific number of members and that certain members have knowledge of specialized disciplines or subject matters, be a member of a particular profession, or be a representative of a state or local

---

[2] *See also* 41 C.F.R. Pt. 102–3, Subpt. C, App. A ("FACA does not specify the manner in which advisory committee members and staff must be appointed . . . . Each agency head may specify those policies and procedures, consistent with the Act and this part, or other specific authorizing statute, governing the appointment of advisory committee members and staff.").

agency.  *E.g.*, 42 U.S.C. § 7409(d)(2)(A)–(B) (CASAC shall be composed of seven members including "at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies").  Other statutory requirements more generally command that members be qualified in the fields and disciplines relevant to the committee's work.  *E.g.*, *id.* § 4365(a)–(b) (members of the SAB "shall be qualified by education, training, and experience to evaluate scientific and technical information on matters referred to the Board under this section").  Finally, some statutes provide that other organizations, such as the National Academy of Sciences, will recommend individuals for membership on EPA's advisory committees.  *E.g.*, 7 U.S.C. § 136w(d)(1).

## III.    EPA GRANT PROGRAMS

EPA's mission under the numerous federal statutes that it administers is to protect human health and the environment.  That mission is accomplished, in part, by the awarding of funds to other organizations to conduct environmental research programs and projects.  Numerous environmental statutes administered by EPA authorize a wide variety of grant programs designed to fund research into environmental issues.  *See, e.g.*, 42 U.S.C. § 7403(b)(3) (Clean Air Act).  Each year, EPA awards more than $4 billion in grant funding—approximately half of its total budget—to state and local governments, tribes, universities, nonprofit organizations, and other recipients.  *See generally* EPA, *EPA Grants Overview for Applicants and Recipients*, https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients/ (last updated July 15, 2019).

## IV.    EPA ADVISORY COMMITTEE DIRECTIVE: "STRENGTHENING AND IMPROVING MEMBERSHIP ON EPA FEDERAL ADVISORY COMMITTEES"

In October 2017, EPA issued a Directive entitled, "Strengthening and Improving Membership on EPA Federal Advisory Committees."  The Directive sets forth principles and

priorities to guide the selection of members for EPA's advisory committees.  The Directive is

premised on EPA's need to rely on "independent, expert advice from a variety of federal

advisory committees to help inform sound decision-making."  Directive at 1.  In a memorandum

accompanying the Directive and issued the same day, EPA explained that FACA requires federal

advisory committees to be "fairly balanced in terms of the points of view represented and the

functions to be performed," 5 U.S.C. § 5(b)(2), and staffed with qualified individuals.  *See* AR

1–5 ("Memorandum").[3]  "In order to strengthen and improve the independence, diversity and

breadth of participation on EPA . . . advisory committees," Directive at 1, the Directive adopts

four, interrelated appointment policies.

Section 1 of the Directive provides that committee members should not receive EPA

grants concurrently with their committee service, to avoid the "appearance or reality of potential

interference with their ability to independently and objectively serve as a [committee] member."

Memorandum at 3 ¶ A.  Relying on principles of cooperative federalism, Section 2 sets forth

EPA's goal to "increase state, tribal and local government participation" on EPA's committees.

*Id.* ¶ B.  In furtherance of this goal, Section 1 does not apply to state, tribal and local government

to non-grant recipients.  *See id*.  Section 3 establishes a policy of encouraging advisory

committee "[p]articipation of members from a broad range of geographic regions—especially

---

[3] All citations to "AR" refer to the certified Administrative Record filed in this case on August 9, 2019 [ECF No. 17], which is substantively identical to the certified Administrative Records filed in two of three prior cases which also challenged the Directive under the APA.  *See* Administrative Record, *Physicians for Social Responsibility v. Wheeler*, 17-cv-02742 (TNM) (D.D.C.) [ECF No. 30]; Administrative Record, *NRDC v. Wheeler*, 18 Civ. 613 (WHP) (S.D.N.Y.) [ECF No. 26].  No Administrative Record was filed in the third case challenging the Directive under the APA, *Union of Concerned Scientists v. Wheeler*, Civil Action No. 18-10129-FDS (D. Mass.), because the district court granted EPA's motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim without requiring production of an Administrative Record.

areas that have historically been unrepresented and underrepresented." *Id.* at 4 ¶ C. Section 4 seeks to encourage "fresh perspectives" through the "inclusion of new candidates" on EPA's advisory committees and requires that "membership should be rotated regularly." Directive ¶ 4.

## STANDARD OF REVIEW

### I.    RULE 12 MOTION TO DISMISS

On a Rule 12(b)(1) motion to dismiss, the party asserting subject matter jurisdiction bears "the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). In considering challenges to subject matter jurisdiction under Rule 12(b)(1) at the pleading stage, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Id.* The Court may also consider evidence extrinsic to the pleadings. *See Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002). However, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Kappa Printing Group, LLC v. Archie Comic Publ'ns, Inc.*, No. 17 CV 7511, 2018 WL 2561032, at *2 (S.D.N.Y. June 4, 2018) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court should begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. If well-pleaded factual allegations exist, the court must then determine whether "they plausibly give rise to an

entitlement to relief." *Id.*  When determining the sufficiency of a plaintiff's claim under Rule 12(b)(6),

> [C]onsideration is limited to the factual allegations in [plaintiff's] . . . complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit.

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

## II.  RULE 56 MOTION FOR SUMMARY JUDGMENT

Ordinarily, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As here, when "a party seeks review of agency action under the APA, the 'entire case on review is a question of law,' such that '[j]udicial review of agency action is often accomplished by filing cross-motions for summary judgment.'"  *See Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 (S.D.N.Y. 2012) (citation omitted).[4]  The Court reviews issues of law *de novo*, *see J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000), but defers to the agency's reasonable interpretation of an ambiguous statute that the agency is charged with administering, *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 843 (1984).  Under the APA, this Court may only hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law" or "unsupported by substantial evidence."  *See* 5 U.S.C. § 706(2); *Bechtel v. Admin. Review Bd.,*

---

[4] As a result of the nature of APA review, it is neither necessary nor appropriate to submit a Local Civil Rule 56.1 statement listing the material facts as to which the moving party contends there is no genuine issue to be tried, and a counter-statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See, e.g.*, *Just Bagels*, 900 F. Supp. 2d at 372 n.7; *Karpova v. Snow*, 402 F. Supp. 2d 459, 465 (S.D.N.Y. 2005), *aff'd*, 497 F. 3d 262 (2d Cir. 2007).

710 F.3d 443, 445–46 (2d Cir. 2013).  This standard of review is narrow and does not give the

Court the authority to substitute its judgment for that of the agency.  *See Motor Vehicles Mfrs.*

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  Additionally,

the Court's review of an agency's action under the APA is generally limited to the administrative

record compiled by the agency.  *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973)

(per curiam).

## ARGUMENT

### I.   NRDC'S APA CLAIMS FAIL FOR LACK OF A MEANINGFUL STANDARD FOR JUDICIAL REVIEW.

NRDC's claims focus on Section 1 of the Directive.  But its Complaint is fundamentally

a challenge to the manner in which EPA may use its power to appoint persons to advisory

committees.  That challenge fails because the agency, for purposes of the APA, has complete

discretion in appointing persons to committees, and hence such decisions are committed to

agency discretion by law and unreviewable under the APA.  Indeed, the Directive itself preserves

the Administrator's discretionary appointment authority by providing that the Administrator

reserves the right to depart from the Directive's procedures where appropriate or to be consistent

with applicable law.  Directive at 1.

### A.   Matters Committed to Agency Discretion by Law Are Not Reviewable.

The APA, 5 U.S.C. §§ 551–706, establishes a waiver of sovereign immunity and a cause

of action for injunctive relief for parties adversely affected by either agency action or agency

failure to act.  *See* 5 U.S.C. §§ 702, 706(1)–(2).  The APA's waiver of sovereign immunity,

however, is limited.  Before review may be had under the APA, "a party must first clear the

hurdle of [5 U.S.C.] § 701(a)," which governs when courts may review the actions or inactions

of agencies. *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  While the APA embodies a

presumption of judicial review, *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670

(1986), "[t]his is 'just' a presumption, . . . and under § 701(a)(2) agency action is not subject to

judicial review 'to the extent that' such action 'is committed to agency discretion by law.'"

*Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S.

340, 349 (1984)).  In *Heckler*, the Court articulated the fundamental inquiry for the application of

section 701(a)(2):

> [E]ven where Congress has not affirmatively precluded review, review is not to be
> had if *the statute is drawn so that a court would have no meaningful standard
> against which to judge the agency's exercise of discretion*.  In such a case, the
> statute ("law") can be taken to have "committed" the decisionmaking to the
> agency's judgment absolutely.

470 U.S. at 830 (emphasis added); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401

U.S. 402, 410 (1971) (section 701(a)(2) applies "where 'statutes are drawn in such broad terms

that in a given case there is no law to apply'") (quoting S. Rep. No. 79-752, at 26 (1945)),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  The Supreme Court

has also recognized that section 701(a)(2) precludes judicial review of "agency decisions that

courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-

sum appropriation, a decision not to reconsider a final action," or a decision not to undertake

enforcement.  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018); *see

also Lincoln*, 508 U.S. at 191.

Heckler underscored that the starting point of any analysis under section 701(a)(2) must

be whether there is a "meaningful standard" provided in the governing statute.  *Lunney v. United

States*, 319 F.3d 550, 558 (2d Cir. 2003).  *See also Webster v. Doe*, 486 U.S. 592, 600 (1988)

(application of section 701(a)(2) "requires careful examination of the statute on which the claim

of agency illegality is based"); *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) (courts "consider

both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action") (citation omitted).  Where the statute does not provide any judicially manageable standard, "regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review." *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988) (per curiam). However, "general statements of policy," 5 U.S.C. § 553(b)(3)(A), which are prospective and do not grant rights or impose obligations, are not treated as binding norms for purposes of identifying "law to apply" in the section 701(a)(2) context.  *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) (citation omitted).  "*Chaney* cast significant doubt upon whether a mere policy statement, as opposed to a properly adopted agency rule, can ever provide law to apply." *Mass. Public Interest Research Grp., Inc. v. U.S. Nuclear Regulatory Comm'n*, 852 F.2d 9, 17 (1st Cir 1988).

First, no review is possible where the relevant statute is so vague and broadly drawn that it does not provide a reviewing court any criteria for evaluating the agency's exercise of its discretion.  *See Heckler*, 470 U.S. at 830; *see also, e.g.*, *Webster*, 486 U.S. at 600 (no criteria provided to evaluate exercise of authority to remove employees whenever the "Director shall *deem* such termination necessary or advisable in the interests of the United States") (citation omitted); *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (power to rescind examiner's license "at any time for any reason the Administrator considers appropriate") (citation omitted); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (aliens shall apply for a visa "at such place as shall be by regulations prescribed") (emphasis and citation omitted); *Claybrook v. Slater*, 111 F.3d 904 (D.C. Cir. 1997) (decision to adjourn an advisory committee).

Second, review is not permitted where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise," including what "best fits the agency's overall policies." *Lincoln*, 508 U.S. at 191, 193 (quoting *Heckler*, 470 U.S. at 831). *See, e.g.*, *Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (agency's refusal to reconsider a prior decision based on an alleged "material error" unreviewable due to the "impossibility of devising an adequate standard of review for such agency action"); *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 405–06 (D.C. Cir. 1990) (no review where Act "sets forth nine specific criteria to be considered in making base closing decisions").

### B.    NRDC Points to No Meaningful Standard for Review.

Appointment of persons to advisory committees is committed to agency discretion for purposes of the APA. GSA regulations implementing FACA clearly state that "[u]nless otherwise provided by statute, Presidential directive, or other establishment authority,[5] advisory committee members serve at the pleasure of the appointing or inviting authority" and their membership terms "are at the sole discretion of" the agency. *See* 41 C.F.R. § 102-3.130(a). FACA also provides that it is the responsibility of the appointing or inviting authority to develop its own procedures to manage its advisory committees. *See* 5 U.S.C. app. 2 § 8(a) ("Each agency head shall establish uniform administrative guidelines and management controls for advisory committees established by that agency, . . ."); *see also* 41 C.F.R. Pt. 102–3, Subpt. C, App. A ("FACA does not specify the manner in which advisory committee members and staff must be appointed. . . . . Each agency head may specify those policies and procedures, consistent with the

---

[5] No such law or authority applies here to limit that discretion in a fashion relevant to the Directive.

Act and this part, or other specific authorizing statute, governing the appointment of advisory

committee members and staff.").  NRDC cannot point to any meaningful standard of review that

governs its challenge to the agency's exercise of this authority and, thus, that power is committed

to agency discretion by law under the APA.  The only *law* that applies to the decision of whom

to appoint to an EPA federal advisory committee is that contained in a statute authorizing

creation of the advisory committee or the FACA—neither of which provide judicially-

meaningful standards for APA review here.[6]  As to the former category, NRDC alleges at one

point that EPA is not selecting the best candidates or the "most qualified" candidates in violation

of advisory committee authorizing statutes, Compl. ¶ 53.  NRDC fails, however, to identify any

manageable standard against which the Court can judge the agency's evaluation of the

qualifications of committee candidates (nor does it attempt to identify any insufficiently qualified

selected candidate, or even any sufficiently qualified candidate that was not selected).[7]  And

while NRDC does invoke the APA's arbitrary and capricious standard, that "cannot be sufficient

by itself to provide the requisite 'meaningful standard'" because, otherwise, "[section]

---

[6] NRDC's Complaint, as it must, seeks review of its FACA-related allegations under the
APA.  FACA itself provides no express private right of action, *see* 5 U.S.C. app. 2 § 1 *et seq.*,
and, as every court to consider the matter has concluded, there is no basis to infer such a right.
*Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("[P]rivate rights of action to enforce
federal law must be created by Congress.") (citations omitted).

[7] NRDC also fails to identify specific authorizing statutes that require the agency to select
the "most qualified" advisory committee members.  Compl. ¶ 53.  Rather, NRDC identifies
statutes that require "a collective degree of scientific expertise" from advisory committee
members.  *Id.*  Indeed, NRDC categorizes these statutes as requiring EPA advisory committee
members to have "relevant scientific expertise in their fields."  *Id.*  Requirements to appoint
members possessing "[a] collective degree of scientific expertise" or "relevant" scientific
expertise do not amount to commands to appoint the "most qualified" scientific experts.  EPA
respectfully submits that in any event Congress has assigned to it, rather than to the judiciary, the
task of determining which candidates are appropriately qualified to serve on its advisory
committees.

13

701(a)(2)'s limitation on APA review would amount to no limitation at all, and nothing would ever be 'committed to agency discretion by law.'"  *Lunney*, 319 F.3d at 559 n.5.

Beyond these authorities, NRDC relies on two provisions of FACA.  Compl. ¶¶ 37, 54. First, the "fair balance" provision, section 5(b)(2), directs that the President or the agency creating an advisory committee must "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  *See* 5 U.S.C. app. 2 § 5(b)(2), (c).  Second, the "inappropriat[e] influence" provision, section 5(b)(3), requires that the President or creating agency put in place "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  5 U.S.C. app. 2 § 5(b)(3), (c).

These provisions are nonjusticiable because Congress has not provided the courts with meaningful standards for determining what is a "fair balance" of viewpoints and what constitutes "inappropriate influence" over an advisory committee.  *See Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 431 (D.C. Cir. 1989) (per curiam) ("*Microbiological*") (Silberman, J., concurring).[8]  Two recent district court cases considering the

---

[8] *Microbiological* was a per curiam decision with each panel member writing separately. Judge Silberman found the requirements of FACA's section 5 to be nonjusticiable, 886 F.2d at 431, Judge Friedman did not specifically address justiciability but concluded that the agency had complied with the statute, *id.* at 424, and Judge Edwards, in dissent, found FACA to be justiciable and would have remanded to the district court, *id.* at 432.  As explained below, courts have widely relied on the reasoning of Judge Silberman's concurrence in *Microbiological* that "fairly balanced" and "inappropriately influenced" claims under FACA section 5(b)(2) are nonjusticiable.  *See, e.g.*, *Physicians for Social Responsibility v. Wheeler*, 359 F. Supp. 3d 27, 44 (D.D.C. 2019) ("The Court . . . agrees with Judge Silberman that neither [Section 5(b)(2) nor 5(b)(3) of FACA] provides a meaningful standard for review."); *Union of Concerned Scientists v. Wheeler*, 377 F. Supp. 3d 34, 48 (D. Mass. 2019) (adopting Judge Silberman's opinion in

*same* APA challenge to the Directive unequivocally held that plaintiffs' claims were non-justiciable because FACA provides no meaningful standards against which to judge EPA's exercise of its discretion in achieving "fair balance" and avoiding "inappropriate influence" when appointing federal advisory committee members.  *See Physicians for Social Responsibility*, 359 F. Supp. 3d at 43–44 (citing *Microbiological*, 886 F.2d at 425–31); *Union of Concerned Scientists*, 377 F. Supp. 3d at 48 (same).

Rather than contemplating judicial review of the agencies' decisions about how to staff its advisory committees, the text of FACA suggests that it is Congress that would play the principal role in reviewing an agency's implementation of the statute.  Section 6 of FACA requires the President to report annually to Congress on the "activities, status, and changes in the composition of advisory committees in existence during the preceding year" including, *inter alia*, "the names and occupations of [the] current members" of each committee.  5 U.S.C. app. 2 § 6(c).  In turn, FACA charges "each standing committee of the Senate and the House of Representatives" with "mak[ing] a continuing review of the activities of each advisory committee under its jurisdiction."  *Id.* § 5(a).  Those provisions reflect Congress's understanding that policy determinations about the management of agencies' advisory committees are "not properly undertaken by life-tenured, unelected federal judges," *Microbiological*, 886 F.2d at 428-29 (Silberman, J., concurring), but are instead "a process best left to the executive and legislative branches of government."  *Ctr. for Policy Analysis on Trade & Health* ("*CPATH*") *v. Office of U.S. Trade Representative*, 540 F.3d 940, 945 (9th Cir. 2008).

---

*Microbiological* that FACA provides "no objective standard to apply to determine when a [federal advisory committee's] membership has achieved a fair balance . . . ."); *Doe v. Shalala*, 862 F. Supp. 1421, 1431 (D. Md. 1994) ("The court agrees with . . . Judge Silberman's [opinion] in *Microbiological* . . . .").

### C.     The Fair Balance Provision of FACA Is Nonjusticiable.

FACA's section 5(b)(2) does not define "fairly balanced," nor does it specify how a "fairly balanced" membership on an advisory committee is to be achieved, in terms of either the type of representatives or their number.  As an initial matter, "even before the points of view on an advisory committee can be balanced at all—'fairly' or otherwise—it must first be determined *which* points of view should be balanced." *Microbiological*, 886 F.2d  at 426 (Silberman, J., concurring).  And there is no "principled basis for a  federal court to determine which among the myriad points of view deserve representation on particular advisory committees." *Id.*  The "relevant points of view on issues to be considered by an advisory committee are virtually infinite." *Id.*; *Doe*, 862 F. Supp. at 1430 ("For the Court to become entangled in determining which viewpoints must be represented is for the Court to arbitrarily substitute its judgment for that of the agency.").

There is similarly no "principled way" to determine whether those views are fairly balanced. *Microbiological*, 886 F.2d at 428 (Silberman, J., concurring).  Such a determination would require the court to make "arbitrary judgments" about "which organizations or individuals qualified as bona fide" representatives of particular policy views.  *Id.* at 428-29; *see also Fertilizer Inst. v. U.S. EPA*, 938 F. Supp. 52, 54 (D.D.C. 1996) (finding the "fair balance" provision nonjusticiable because it would raise "difficult questions" such as, "What qualifications must someone have in order to be deemed an adequate representative of the chemical producers?  What if there is a diversity of views among different chemical producers –

whose views would then represent the industry?").  Such a task is a hopelessly manipulable

policy choice that is "best left to the other branches of government."  *CPATH*, 540 F.3d at 945.[9]

The weight of authority has therefore concluded that "fairly balanced" claims under

section 5(b)(2) of FACA are nonjusticiable.  *See id.* (FACA fails to "articulate what perspectives

must be considered when determining if the advisory committee is fairly balanced[;]" the statute,

therefore, "provide[s the court] with no meaningful standards to apply"); *Fertilizer Inst.*, 938 F.

Supp. at 54 ("For the Court to become entangled in determining what represents a 'fair balance'

would require the Court to arbitrarily substitute its judgment for that of the agency.  No

meaningful standards are available to assist the Court in making such determinations."); *Doe*,

862 F. Supp. at 1430 ("The balance of judicial opinion holds that, by reason of the lack of

judicial standards to address alleged 'imbalances' of membership on such committees, Courts

will not decide the issue; it is non-justiciable.") (citing, *inter alia*, *Microbiological*, 886 F.2d at

425) (Silberman, J., concurring); *Pub. Citizen v. Dep't of Health & Human Servs.*, 795 F. Supp.

1212, 1220–21 (D.D.C. 1992) (citing *Microbiological*, 886 F.2d at 426 (Silberman, J.,

concurring)).  In accord with these authorities, two district courts recently concluded that section

5(b)(2) does not provide a standard for reviewing the Directive.  *Physicians for Social*

*Responsibility*, 359 F. Supp. 3d at 44–45 (FACA "does not define what constitutes a 'fairly

balanced' committee," and provides no "'principled way' to determine whether those views are

---

[9] And even if Congress intended that there be judicial review of agency compliance with the "fairly balanced" requirement, such review would be constitutionally suspect since Congress may not constitutionally confer on the judiciary the power to make policy choices unguided by statutory standards.  *Microbiological*, 886 F.2d at 430 n.6 (Silberman, J., concurring); *cf. Metcalf v. Nat'l Petrol. Council*,  553 F.2d 176, 190 (D.C. Cir. 1977) ("[T]o supervise the membership . . . of federal advisory committees on a continual basis and to alter the composition of these committees according to our subjective determinations as to 'fair balance'" would place the court in the "[inappropriate] role as the 'continuing monitors of the wisdom and soundness of Executive action.'") (citation omitted).

fairly balanced") (quoting *Microbiological*, 886 F.2d at 426 (Silberman, J., concurring)); *Union of Concerned Scientists*, 377 F. Supp. 3d at 48 ("The Court agrees that there is no objective standard to apply to determine when a [federal advisory committee's] membership has achieved a fair balance, and when it has not").  There are no decisional standards here for the Court to apply concerning the appropriate appointment philosophy for EPA to follow in establishing "fairly balanced" advisory committees.  Accordingly, NRDC's fair balance claim as to the composition of EPA's advisory committees is not justiciable.

### D.      The Inappropriate Influence Provision of FACA Is Nonjusticiable.

Similarly, Congress did not define "inappropriately influenced" or "special interest," nor did it specify any procedures to assure that the "advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest," within the meaning of section 5(b)(3).  To determine whether an advisory committee's advice and recommendations have been inappropriately influenced by the appointing authority or special interests, a reviewing court would need to answer at least three questions.  First, the Court would need to determine "when an interest is 'special' as opposed to 'general[.]'" *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring).  But a court does not "have any way to determine what [special interest] means for purposes of judicial review . . . [as] virtually anyone in the United States . . . [c]ould have . . . a special interest with regard to some – perhaps all – advisory committees."  *Id.* at 430–31.

Second, a court must be able to determine when a special interest (or the appointing authority) exerted "inappropriate influence."  In *Colorado Environmental Coalition v. Wenker*, 353 F.3d 1221, 1231 (10th Cir. 2004) (per curiam), the court explained that "[t]he problem we have with this claim centers on the word 'inappropriate,'" given that the applicable statute and

the relevant regulations had "call[ed] for various special interest groups to recommend candidates for appointment" to the committee and that "[i]t goes without saying that the special interests will recommend nominees who agree with their point of view."  *Id.*  Consequently, the court concluded that "the statute does not give us any guidance as to when the line is crossed between appropriate and inappropriate influence."[10]  *Id.*; *see also Microbiological*, 886 F.2d at 431 (Silberman, J., concurring) ("[W]hat legally discernible principles could be employed to determine when a particular special interest is overly represented—when its influence is 'inappropriate?'").  *See also Union of Concerned Scientists*, 377 F. Supp. 3d at 49 (section 5(b)(3) of FACA "fails to provide a meaningful standard of judicial review" because court would have to "first identify whether something is a 'special interest,' then decide whether that special interest could 'influence' a particular FAC, and finally, determine whether that influence, if any, rises to the level of 'inappropriate.'").

Finally, section 5(b)(3) "on its face, is directed to the establishment of *procedures* to prevent 'inappropriate' external influences on an already constituted advisory committee by outside special interests or the appointing body."  *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring); *see also Physicians for Social Responsibility*, 359 F. Supp. 3d at 47.  A court would thus need to put itself in the shoes of the President or agency head and determine how, preemptively, to prevent special interests (whatever they are) from exerting inappropriate influence (whatever that is) over an advisory committee.  Courts are ill-suited to craft such

---

[10] In reaching its conclusion, the Tenth Circuit broke ranks with the Fifth Circuit, which found section 5(b)(3) to be justiciable.  *See Cargill, Inc. v. United States*, 173 F.3d 323 (5th Cir. 1999).  The *Cargill* court's explanation of *why*, however, was scant.  It stated only that section 5(b)(3) is more "objective" than the "fairly balanced" requirement, which it also found to be justiciable, *see id.* at 335.  The explanation for that conclusion, in turn, was hardly persuasive— and, indeed, was rejected by *CPATH*, 540 F.3d at 946 ("[T]he *Cargill* decision offers little explanation *why* FACA's fairly balanced requirement is justiciable.").

safeguards out of whole cloth, as doing so is "really an executive branch function." *Fertilizer Inst.*, 938 F. Supp. at 54–55. *See also Physicians for Social Responsibility*, 359 F. Supp. 3d at 47 ("Section 5(b)(3) offers no suggestion of what those procedures [to prevent inappropriate influence] would look like.  The Court declines to craft them from whole cloth with no guidance from the statute.").

FACA provides this Court with no meaningful standard against which to answer any of these three questions and, as a result, determine whether EPA's advisory committees are being inappropriately influenced by the agency or special interests.  *Union of Concerned Scientists*, 377 F. Supp. 3d at 49 (FACA section 5(b)(3) does not provide a meaningful standard for review of the Directive); *Physicians for Social Responsibility*, 359 F. Supp. 3d at 47 (same).  If anything, one stated goal of the Directive is to *limit* the potential for inappropriate influence, if any, that receiving an EPA grant may present, and thus is consistent with the purpose of FACA. It is of no moment that a plaintiff may offer a standard that *it* believes is wise and reasonable. What is dispositive is that *Congress* has set forth no meaningful guidance for the Court to follow in answering such questions as what constitutes a special interest, when influence becomes inappropriate, and what sorts of steps must be taken to prevent special interests (or the appointing authority) from exerting inappropriate influence.  Resort to any other authority would amount to the Court "mak[ing] a policy judgment, and an arbitrary one at that, as to the optimum character of the Advisory Committee," *Microbiological*, 886 F.2d at 431 (Silberman, J., concurring), which is an "utterly nonjudicial task," *id.* at 427.

## II.     THE EPA DIRECTIVE HAS A RATIONAL BASIS AND IS NOT ARBITRARY OR CAPRICIOUS.

Even if the Court concludes that NRDC has raised justiciable claims, the Court should still enter judgment for EPA.  The Directive easily clears the hurdle of arbitrary and capricious review and NRDC's contentions to the contrary lack merit.

### A.     The APA's Arbitrary and Capricious Standard of Review

Under the APA, agency actions may only be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This is a narrow, deferential standard that prohibits the Court from substituting its judgment for that of the Agency.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### B.     The Directive Constitutes a Reasonable Exercise of EPA's Highly Discretionary Authority to Manage Its Federal Advisory Committees.

The Directive sets forth principles and priorities to guide the selection of members for EPA's advisory committees, with a particular focus on ensuring committee independence from EPA and on achieving a fair balance on its FACs.  The document contains four separate sections, each of which is aimed at a specific aspect of the overarching policy goal of encouraging fresh perspectives on EPA committees by seeking to expand the diversity and independence of committee membership.  Section 4 of the Directive, "Promote Fresh Perspectives," highlights this fundamental theme of the document, stating that the Directive seeks to encourage the "inclusion of new candidates" on EPA's advisory committees by requiring that "membership should be rotated regularly."  Directive ¶ 4.

The Directive evolved out of the agency's decisions on the periodic need to appoint or re-appoint committee members.  The Directive is a product of EPA's decision to issue guidance for the exercise of that discretionary power, as informed by Congressional recommendations,

stakeholder feedback, prior EPA policies, and principles of federalism underlying environmental laws—all of which indicated that EPA should make some fundamental changes in how it administered the agency's 22 advisory committees.

The explanatory statement for the Consolidated Appropriations Act of 2016, for example, noted "long standing questions regarding conflicts of interest" over "multiple administrations." *See* 161 Cong. Rec. H10161, H10220 (December 17, 2015) (AR 76, 79).  Consequently, the explanatory statement recommended that EPA develop a policy statement on "science quality and integrity," and to base that policy "on a variety of factors including receipt of former and current Federal grants."  *Id*.  The explanatory statement also recommended that the policy statement "should include goals on increasing memberships from States and tribes who are often underrepresented."  *Id*.  The explanatory statement also stated that, if EPA "decide[d] that financial-related metrics are appropriate to identify conflicts-of-interest or bias," EPA's policy statement should also include "an evaluation of potential bias based on a variety of factors[,] including receipt of former or current Federal grants," as well as "other appropriate safeguards to ensure balance amongst [Science Advisory Board] and other advisory board experts."  *Id.* Similar concerns have been repeatedly expressed in correspondence to EPA from Congress and representatives of state and local governments.  *See, e.g.,* AR 51–52 (2012 letter from Rep. Andy Harris expressing concerns about the "balance" and "impartiality" of EPA FACs); AR 629–32 (2015 letter from Council of State Governments–West expressing concern about the perceived "lack of state/local participation" on EPA advisory committees).  EPA's Directive contains provisions that were intended to address Congressional and public requests that EPA take action to ensure that its advisory committees are fairly balanced, independent, and transparent.

1.      **EPA Directive Section 1: Strengthen Member Independence**

In addition to Section 4 of the Directive discussed above, each of the other sections of the

Directive is a reasoned response to these points.  Section 1 of the Directive, which is the focus of

NRDC's suit, seeks to ensure "integrity and confidence" in EPA's advisory committees by

directing that members "avoid financial entanglements with EPA to the greatest extent possible."

Memorandum at 3 ¶ A.  The Directive states that its general policy that committee members

should not receive EPA grants concurrently with their committee service will contribute to the

independence of EPA advisory committees and avoid the "appearance or reality of potential

interference with the[] ability to independently and objectively serve as a [committee] member."

*Id.*[11]  Specifically, the Memorandum explains that:

> Ensuring [committee] member independence strengthens the integrity, objectivity
> and reliability of EPA [committees]. Accordingly, *in addition to* EPA's existing
> policies and legal requirements preventing conflicts of interest among the
> membership of EPA's [committees], it shall be the *policy* of the Agency that no
> member of an EPA federal advisory committee currently receive EPA grants . . . ."

Memorandum at 3 ¶ A (emphases added).  This policy on advisory committee appointments is

responsive to the repeatedly expressed views of Congress referenced above and elsewhere in the

administrative record.  *See e.g.* AR 25–29; AR 55–56; AR 578–81; AR 629–32.  It also describes

the agency's policy view about how best to ensure public confidence and reliable decision

---

[11] This provision of the Directive is consistent with policy directives of past
administrations.  On June 10, 2010, for example, President Obama directed all executive
departments and agencies "not to make any new appointments or reappointments of federally
registered lobbyists to advisory committees and other boards and commissions."  Lobbyists on
Agency Boards and Commissions, 75 Fed. Reg. 35,955 (June 18, 2010).  The Obama
appointment policy, like this Directive, was established to ensure the efficacy and independence
of the decision making process on these boards and committees and to maintain public trust in
these institutions.  *See id.* (justifying the policy on the ground that lobbyist service on
committees and boards "can perpetuate the culture of special-interest access" and "drown[] out
the voices of ordinary Americans").

making on its advisory committees, a matter over which the agency has wide discretion.  *See* 41 C.F.R. § 102-3.130(a) ("committee members serve at the pleasure of the appointing authority"). Finally, like the Directive as a whole, Section 1 is informed by the agency's understanding of its obligations under FACA.  *See* Memorandum at 2–3, AR 2–3 (stating that FACA requires committees to operate in an "independent" manner and that Section 1 of the Directive helps ensure that "members remain independent of the Agency during their service").

### 2. EPA Directive Section 2: Increase State, Tribal and Local Government Participation

Section 2 of the Directive sets forth the agency's goal to "increase state, tribal and local government participation" on EPA's committees.  Directive ¶ 2.  This Section embodies the principle of cooperative federalism,[12] whereby EPA coordinates with states, tribes, and local communities to assist EPA in, and in many cases assume primary responsibility for certain aspects of, its mission to protect human health and the environment.  *See* Memorandum at 3. The agency has decided that an appropriate means to this end is to ensure that state, local, and tribal government perspectives "figure prominently" on EPA's committees.  Memorandum at 3 ¶ B; *see also* Directive ¶ 2.  This policy also explains Section 1's exception for state, local, and tribal government officials who receive EPA grant funding to serve on EPA's committees. Excluding such local public servants from EPA's committees would undermine EPA's policy to increase state, local, and tribal perspectives on EPA's committees.

---

[12] *See, e.g.*, Clean Air Act, 42 U.S.C. § 7401(a)(3) ("air pollution prevention . . . is the primary responsibility of States and local governments"); *id.* § 7407 (laying out a procedure for consulting with states when making air quality designations); Clean Water Act, 33 U.S.C. § 1251(b)(1) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ."); *see also, e.g.*, *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1617 (2014) (Clean Air Act is a program based on "cooperative federalism").

NRDC objects that the Directive does not "explain the differential treatment of recipients of state, local, and tribal assistance grants." Compl. ¶ 56. But even aside from the clear Congressional guidance to increase state, local and tribal participation on FACs, the principles of "cooperative federalism" that underlie most major environmental statutes establish the reasonableness of EPA's efforts to enhance state, local, and tribal participation on EPA's committees. EPA also received numerous communications from Congress and representatives of state and local agencies encouraging EPA to increase state, local, and tribal participation on committees. *E.g.*, AR 587–89 (letter from Association of Air Pollution Control Agencies recommending increased state, local and tribal participation on committees).

### 3.    EPA Directive Section 3: Enhancing Geographic Diversity

Section 3 of the Directive reflects EPA's decision that EPA should encourage advisory committee "[p]articipation of members from a broad range of geographic regions – especially areas that have historically been unrepresented and underrepresented." Memorandum at 4 ¶ C. Accordingly, with the "exception of committees established to specifically address regional/area specific issues," section 3 of the Directive directs EPA to seek "geographic diversity" in its committee membership. *Id.* As the Memorandum notes, "the distinctive experiences, climates and environmental issues facing citizens spread across the United States naturally necessitates strong geographic diversity so that extensive regional perspectives are represented on [committees]." *Id.*

Numerous parties over several years have recommended that EPA act to promote greater geographic diversity on its committees. By letter dated July 14, 2016, seven Representatives wrote to former EPA Administrator Gina McCarthy in connection with a request for new nominations to the CASAC that it was "vitally important that different EPA Regions are

represented to ensure a fair balance of experts and experience."  AR 48.  The letter noted that

there had been no CASAC members from EPA Regions 6, 7, and 8 since 2010.[13]  *Id.*; *see also*

AR 25–29.  Many stakeholder entities have also supported greater geographic diversity on EPA's

committees.  AR 580; AR 629, 631.

### 4.     EPA Directive Section 4: Promoting Fresh Perspectives.

As discussed above, Section 4 of the Directive seeks to encourage the "inclusion of new

candidates" on EPA's advisory committees by requiring that "membership should be rotated

regularly."  Directive ¶ 4.  This section of the Directive builds on existing EPA policies such as

the six-year term limit for members on the CASAC.  AR 88; *cf.* AR 413 (EPA's Peer Review

Handbook advising the agency to select new peer reviewers who will provide fresh perspectives

to the review of a work product).  Members of Congress and representatives of state and local

governments also weighed in on the need to bring fresh perspectives and ideas to EPA's advisory

committees.  *See e.g.*, AR 25 (recommendation of Senator Inhofe recommendation to bring fresh

perspectives to CASAC).

### C.     NRDC's Challenges to the Directive Are Meritless.

### 1.     The Directive Is Neither Inconsistent with, Nor Prohibited by, Ethics Laws.

NRDC challenges Section 1, alleging that it is "procedurally and substantively

inconsistent with [federal conflict-of-interest laws]."  Compl. ¶ 43.  NRDC appears to have here

misunderstood both the ethics laws and the Directive.  In support of their contention, NRDC

cites an Office of Government Ethics ("OGE") regulation in 5 C.F.R. Part 2640, which covers a

subject matter entirely distinct from an agency's federal advisory commitment appointment

---

[13] These regions encompass states in the southwest, the plains, and the mountain west.
*See* http://www.epa.gov/aboutepa/.

policy. *Id.* ¶ 44 (citing 5 C.F.R. § 2640.203(g)). The OGE regulations at Part 2640 were issued

under the conflict of interest statute, 18 U.S.C. § 208, which gives OGE authority to provide

exemptions from criminal and civil liability for certain financial interests that are "too remote or

too inconsequential to affect the integrity" and to provide "guidance" to agencies in regard to

their authority to exempt persons from liability in certain circumstances. 18 U.S.C. § 208(b); *see*

*also* 5 C.F.R. § 2640.101.

EPA did not need to "consider the existing conflict of interest regulations or justify

departing from them when issuing the Directive," *see* Compl. ¶ 54, because the federal conflict-

of-interest laws and the Directive have different purposes, scope, and means. The Directive does

not govern the standards of conduct of individual government employees and the penalties for

violation of such standards. Rather, the Directive articulates the agency's policy views with

respect to the proper exercise of EPA's discretionary authority to appoint committee members

and how best to effectuate the agency's understanding of its obligation under FACA to ensure an

"independent" committee membership. *Compare* Memorandum at 2 (FACA requires

"independent" committees) *with* 5 U.S.C. app. 2 § 5(b)(3) (stating that advisory committee

members must not be "inappropriately influenced by the appointing authority"). The Directive

imposes no standard of conduct on government employees like the conflict of interest laws; it is

oriented to the *agency's* appointment philosophy that *it* will apply with respect to its

committees.[14] Whether a particular financial interest will cause a committee member to incur

civil or criminal liability under the conflict of interest statute is entirely distinct from how the

agency should apply its discretion in determining the proper composition of those committees.

---

[14] And because the Directive is in no sense an ethics regulation, those laws and rules also provide no meaningful standard for the Court's review of the Directive. *See* 5 U.S.C. § 701(a)(2).

The agency did not issue the Directive as a "conflicts of interest" policy, but rather, as an *appointments* policy.  That appointments policy addresses *all* aspects of advisory committee membership, including the apparent public perception that advisory committee members were not sufficiently objective because, among other reasons, they were receiving EPA grants while serving on EPA advisory committees.  That public perception is amply reflected in the record here.  *See, e.g.,* AR 76, 79 (161 Cong. Rec. H10161, H10220 (December 17, 2015) recommending that EPA develop a policy statement on "science quality and integrity," and "conflicts of interest" and to base that policy "on a variety of factors including receipt of former and current Federal grants"); *id.* (recommending that the policy statement "should include goals on increasing memberships from States and tribes who are often underrepresented."); AR 51–52 (2012 letter from Representative Andy Harris expressing concerns about the "balance" and "impartiality" of EPA FACs); AR 629–32 (2015 letter from Council of State Governments–West expressing concern about limited participation of state officials on EPA FACs).

Contrary to NRDC's assertions here, two courts which recently considered the same argument held that there was no inconsistency between federal conflict-of-interest laws and regulations and the Directive.  In *Physicians for Social Responsibility*, the district court for the District of Columbia observed:

> Section 208 and the OGE regulations do not dictate whom Administrators must, or even should, appoint to federal advisory committees.  To say that certain individuals may not serve is very different than saying that the rest must serve . . . . And if an agency selects advisory committee members under a high ethical standard than what the conflict of interest statute and OGE regulations require, that is entirely compliant with FACA's requirement that committee members not be conflicted.

359 F. Supp. 3d at 41.  *See also Union of Concerned Scientists*, 377 F. Supp. 3d at 45 (holding that the federal conflict-of-interest statute and OGE regulations do not apply to the Directive).

28

### 2.     The Directive Is Consistent with FACA

The Memorandum directly refutes NRDC's assertion that EPA did not "explain how the Directive's prohibition on advisory committee service by EPA research grant recipients is consistent with" the agency's obligation under FACA "to ensure that advisory committees are not subject to inappropriate influence from any special interest and are fairly balanced."  Compl. ¶ 54.  The Memorandum recognizes that "the Federal Advisory Committee Act . . . generally requires that the [committees] operate in an independent, orderly, balanced, and transparent manner."  AR 2.  The Memorandum explains how the new policies adopted by the Directive are designed to further FACA's "fair balance" and "inappropriately influence" requirements for EPA's committees.  The Directive provides that several changes must be made to EPA's prior appointment policy in furtherance of FACA's fair balance goal: (1) state, local, and tribal representation should be increased; (2) the geographic underrepresentation of certain areas should be corrected; and (3) where possible, qualified committee members with fresh perspectives should be selected.  And Section 1's policy with regard to EPA grant recipients further contributes to this goal of ensuring the presence of fresh perspectives while also carrying out FACA's mandate to avoid inappropriate influence by the appointing authority.  Thus, the Directive is consistent with FACA's requirements and with EPA's policy judgment as an advisable means to further them.  That the appointment policy may not accord with *NRDC's* view on how best to balance EPA's advisory committees does not establish any inconsistency with FACA or any deficiency in the Directive's development.

### 3.     EPA Will Continue to Appoint Highly Qualified Individuals to Its FACs

NRDC next contends that Section 1 of the Directive is "incompatible with a statutory requirement to appoint the most qualified advisory committee members," Compl. ¶ 53.  First,

that allegation is refuted by the Directive's specific statement that "it is in the public interest to

select the most qualified, knowledgeable, and experienced candidates." Directive at 1. Second,

the Complaint does not identify any allegedly unqualified or marginally-qualified scientist

appointed to a committee since the Directive was adopted nearly two years ago. *See Physicians*

*for Social Responsibility*, 359 F. Supp. 3d at 48 ("Under the Directive there remains a universe of

qualified scientists, academics, physicians, and experts capable of conducting the scientific

decision-making EPA needs."). Nor can NRDC plausibly allege that only scientists currently

receiving EPA grant funding could be highly qualified and capable of providing advice on

environmental issues. Finally, as stated above, to the extent that NRDC is alleging that EPA is

not selecting the best candidates or the "most qualified" candidates, Compl. ¶ 53, the Complaint

is also subject to dismissal pursuant to 5 U.S.C. § 701(a)(2) for failure to identify any

manageable standard against which the Court can judge EPA's selection decisions.[15] *See*

*Physicians for Social Responsibility*, 359 F. Supp. 3d at 48 ("evaluating the relative

qualifications of potential committee members is exactly the kind of discretionary

decisionmaking that is precluded from judicial review" under 5 U.S.C. § 701(a)(2)).

### 4.  The Directive Is the Product of Reasoned Decision-Making.

---

[15] NRDC's Complaint also cites an Office of Management and Budget ("OMB") guidance document addressing peer review of scientific analysis, "Final Information Quality Bulletin for Peer Review," 70 Fed. Reg. 2664, 2669 (Jan. 14, 2005). *See* Compl. ¶ 39. The OMB Bulletin's provisions demonstrate that it is not binding on any agency, and instead is a "general statement of policy," under the APA. 5 U.S.C. § 553(b)(3)(A). For example, the Bulletin clearly recognizes that "agencies are granted broad discretion to weigh the benefits and costs of using a particular peer review mechanism for a specific information product," 70 Fed. Reg. at 2665. Non-binding guidance documents such as the OMB Bulletin, as mere prospective policy statements, do not provide sufficient "law" to establish a meaningful standard for judicial review. *See Heckler*, 470 U.S. at 833 (agency policy statement does not provide law to apply to defeat a section 701(a)(2) argument). "In determining whether agency statements create such a standard, the Court inquires whether the statements create binding norms by imposing rights or obligations on the respective parties." *Steenholdt*, 314 F.3d at 638. The OMB Bulletin does not.

NRDC further asserts the generalized allegation that the Directive "demonstrate[s] a lack of reasoned decision-making" and failed to "consider alternatives to an outright ban."  Compl. ¶ 55.  Confronted with years of the status quo and in light of public and Congressional recommendations, new leadership at EPA reasonably concluded that it should take steps to increase the independence and diversity of its committees.  NRDC's objections are insufficient to overcome the APA's highly deferential arbitrary and capricious standard of review.  That standard permits the court to overturn an agency action only where the agency has:

> [R]elied on factors which Congress ha[s] not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (*quoting Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  As noted, the Directive and Memorandum comprehensively articulate the basis for each of EPA's four appointment policies contained in the Directive.

### 5.    The Directive Adequately Explained the Reasons for Its Adoption.

Finally, NRDC's Second Claim for Relief conclusorily asserts that the Directive does not explain its "sharp departure from EPA's past practice."  Compl. ¶¶ 60–61.  The Memorandum, however, provides a detailed rationale for each of the four changes made by the Directive.  The Memorandum and Directive articulate the reasons for the new initiatives set forth in the Directive—such as to "promote fresh perspectives," Directive ¶ 4, and to "strengthen the integrity, objectivity and reliability of EPA [committees]," thus acknowledging a change in policy.  Memorandum at 3 ¶ A.  In addition, the Memorandum clearly acknowledges that it sets out a change in approach.  *E.g.*, *id.* at 2 ("in order to ensure *broader* participation"; "This memorandum accompanies, and explains the principles underlying, a set of directives intended to

*strengthen and improve* the composition of EPA's FACs . . . ."), 4 (calling for more participation

of members from "areas that have *historically* been unrepresented or underrepresented")

(emphases added).  The APA requires no more.  *See FCC v. Fox Television Stations, Inc.*, 556

U.S. 502, 515 (2009) ("it suffices that the new policy is permissible under the statute, that there

are good reasons for it, and that the agency *believes* it to be better, which the *conscious change of*

*course* adequately indicates") (first emphasis in original).

Indeed, in *Physicians for Social Responsibility*, the district court agreed that "EPA

believes its new appointment policy is better, and EPA sufficiently gave its reason for adopting

it."  359 F. Supp. 3d at 50.  Specifically, it held that "[t]he Directive is a reasonable exercise of

the Administrator's broad appointment discretion, and EPA's explanation that it sought to

'ensure integrity and confidence in [its] [advisory committees],'  . . . fits comfortably within the

zone of reasonableness" required by the APA.  *Id.* (quoting Memorandum at 3).  In *Union of*

*Concerned Scientists*, the district court likewise held that "[t]he EPA has also provided an

adequate explanation for the directive, to the extent that it represents a departure from previously

established agency policy."  377 F. Supp. 3d at 46.  Accordingly, the Directive was an

appropriate exercise of EPA's discretionary authority to change its policy with respect to the

appointment of federal advisory committee members, and NRDC has proffered no reason for this

Court to hold otherwise.

## III.   NOTICE-AND-COMMENT RULEMAKING WAS NOT REQUIRED.

In Count III of its Complaint, NRDC asserts that the Directive was procedurally defective

under the APA because EPA did not use notice-and-comment rulemaking.  Compl. ¶¶ 64–67.

The Directive did not qualify as a legislative rule subject to notice-and-comment rulemaking

under 5 U.S.C. § 553(b), because the Directive is a general statement of policy concerning the

agency's discretionary use of its committee appointment power.

Under the APA, an agency is required to use notice-and-comment rulemaking to make "legislative" rules, but those requirements do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Lincoln,* 508 U.S. at 196 (quoting 5 U.S.C. § 553(b)). Legislative rules "create new law, rights, or duties, in what amounts to a legislative act." *New York State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 131 (2d Cir. 2001) (internal citation omitted). Legislative rules also "bind members of the agency and the public . . . [and] can impose obligations on members of the public distinct from, and in addition to, those imposed by statute." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000).

By contrast, general statements of policy which are exempt from notice-and-comment are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 196-97 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). *See also Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions") (citation omitted); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (a "general statement of policy" is an "agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule").

EPA's Directive is a general statement of policy, not a legislative rule which alters "existing rights and obligations," or creates "new law, rights, or duties." Although NRDC alleges that the Directive was subject to notice-and-comment rulemaking because it "substantially affects individuals outside of EPA, including co-investigators and other

researchers working on projects with scientists who serve on EPA advisory committees," Compl. ¶ 66, the Directive does not forbid any person from seeking a grant or a committee position.  *See* Directive, at 1.  Nor can the Directive logically alter any existing "right" to serve on an advisory committee, because FACA does not confer any personal right to be appointed to a committee. *See Microbiological*, 886 F.2d at 423 ("Section 5 [of FACA], however, 'confers no cognizable personal right to an advisory committee appointment.'") (quoting *Nat'l Anti-Hunger Coal. v. Exec. Comm. of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071,1074 n.2 (D.C. Cir. 1983)).

The decision whether to appoint a federal advisory committee member lies within EPA's sole discretion, 41 C.F.R. § 102-3.130(a), and the Directive simply provides transparency as to how EPA intends to exercise this discretion prospectively.  EPA appropriately enunciated the principles that would inform the exercise of its discretionary power to appoint, but doing so was not legislative rulemaking.  *See Noel*, 508 F.2d at 1030-31 (where INS district directors had discretionary authority to extend a removable alien's voluntary departure time, INS policy directive counseling against such extensions except under compelling circumstances was not subject to notice and comment; directive was "a statement by the agency of its general policy as a guideline" for directors' exercise of discretion).  Because the Directive did not amount to a "legislative rule," notice-and-comment rulemaking was not required, and this Court should dismiss Count III of the Complaint for failure to state a claim.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion to Dismiss or in the Alternative for Summary Judgment and dismiss this case for lack of jurisdiction and/or failure to state a claim or enter judgment for the Defendants.

Dated:   New York, New York
         August 23, 2019

GEOFFREY S. BERMAN
United States Attorney
*Attorney for Defendants*

By:   _____/s/ Tomoko Onozawa_____
TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone:  (212) 637-2721
Facsimile:  (212) 637-2686
E-mail:  tomoko.onozawa@usdoj.gov