# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | NO. 1:19-cv-05174-DLC<br>ECF CASE |
| Plaintiff, | |
| v. | |
| ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental Protection Agency, | |
| Defendant. | |

**AMICI CURIAE BRIEF OF THE STATES OF WASHINGTON, CALIFORNIA, CONNECTICUT, MARYLAND, NEW JERSEY, NEW YORK, OREGON, PENNSYLVANIA, THE COMMONWEALTH OF MASSACHUSETTS, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.  INTRODUCTION.........................................................................................................2

II.  IDENTITY AND INTEREST OF AMICI CURIAE ................................................4

III.  ARGUMENT ..............................................................................................................6

    A.  The Directive Excludes Independent Voices Contributing to EPA
        Science Based on Non-Existent Conflicts of Interest .......................................6

    B.  The Directive Results in Concrete Harms to EPA's Mission and the
        Entities and Individuals Regulated By, or Reliant Upon, EPA's Work ..........11

IV.  CONCLUSION ........................................................................................................13

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982)......................................................................................................4

*Am. Farm Bur. Fed'n v. EPA*,
  559 F.3d 512 (D.C. Cir. 2009) ....................................................................................12

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007) ....................................................................................12

*Natural Res. Def. Council v. EPA*,
  808 F.3d 556 (2d Cir. 2015) ........................................................................................12

*Ohio Valley Envtl. Coal. v. Fola Coal Co.*,
  120 F. Supp. 3d 509 (S.D. W.V. 2015).......................................................................12

*United States v. Hercules, Inc.*,
  247 F.3d 706 (8th Cir. 2001) .......................................................................................12

*United States v. Phillip Morris USA, Inc.*,
  449 F. Supp. 2d 1 (D.D.C. 2006).................................................................................10

*United States v. Vertac Chem. Corp.*,
  33 F. Supp. 2d 769 (E.D. Ark. 1998)..........................................................................12

*W. Org. of Res. Councils v. David Bernhardt*,
  No. CV 18-139-M-DWM, 2019 WL 3805125
   (D. Mont. Aug. 13, 2019) ......................................................................................3, 11

### <u>Other Authorities</u>

Adam Tamburin & Jason Gonzales, *Tennessee Tech Professors 'Begging'
  Leaders to Disavow Contested Emissions Research*, Tennessean (Feb. 19,
  2018)
    https://www.tennessean.com/story/news/politics/2018/02/16/tennessee-tech-
    professors-begging-leaders-disavow-contested-emissions-research/345773002/ .........10

Besley, et al., *Perceived Conflict of Interest In Health Science Partnerships*, Plos
  (Apr. 20, 2017)
    http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0175643 ...................9

Elisa Tong, Stanton Glantz, *Tobacco Industry Efforts Undermining Evidence Linking Secondhand Smoke With Cardiovascular Disease*, Circulation, Vol. 116, Issue 16, Oct. 16, 2007.
http://circ.ahajournals.org/content/116/16/1845.full.pdf?download=true ....................10

Emily Holden, Anthony Adragna, *Major Trump Donor Helped Pruitt Pick EPA Science Advisors*, Politico (June 8, 2018),
https://www.politico.com/story/2018/06/08/doug-deason-trump-donor-helped-pruitt-pick-epa-science-advisers-603450 ..................................................................9

EPA Administrator Christine Todd Whitman, Remarks at the EPA Science Forum (May 1, 2002),
https://archive.epa.gov/epapages/newsroom_archive/speeches/7f46885c354710 8e8525701a0052e439.html ...........................................................................................11

EPA Online Grants Database,
https://yosemite.epa.gov/oarm/igms_egf.nsf/AllGrantsNarrow?SearchView&Q uery=(FIELD%22Applicant_Type%22=%22State+Institution+of+Higher+Lear ning%22)AND(FIELD%22Applicant_State%22=%22WA%22)&SearchOrder =1&SearchMax=1000&SearchWV=false&SearchFuzzy=false&Start=1&Count =500 .......................................................................................................................5

Joanna K. Sax, J.D., Ph.D., *Protecting Scientific Integrity: The Commercial Speech Doctrine Applied to Industry Publications*,
37 Am. J.L. & Med. 203, 206 (2011) ............................................................................10

Lars Noah, *Scientific "Republicanism": Expert Peer Review and the Quest for Regulatory Deliberation*,
49 Emory L.J. 1033, 1051 (2000) ..................................................................................12

Liza Gross, Lindsey Konkel, Elizabeth Grossman, *EPA Swaps Top Science Advisers With Industry Allies*, Reveal (Nov. 17, 2017),
http://www.revealnews.org/article/epa-swaps-top-science-advisers-with-industry-allies/ ................................................................................................................9

Preet Bharara, Christine Todd Whitman, *Proposals for Reform Volume II: National Task Force on Rule of Law & Democracy* 34 (Oct. 3, 2019),
https://www.brennancenter.org/sites/default/files/2019-09/2019_10_TaskForce%20II_0.pdf. ...........................................................................7

Robert M. Sussman, *Science and EPA Decision-Making*,
12 J.L. & Pol'y 573 (2004) ........................................................................................6, 11

Scott Waldman, *Science adviser allowed oil group to edit research*, Climatewire, (Dec. 10, 2018),
https://www.eenews.net/climatewire/stories/1060109129 .............................................8

Sean Reilly, *EPA scraps science panel: 'Your service ... has concluded'*, E&E
　　News (Oct. 12, 2018),
　　https://www.eenews.net/stories/1060102455 ....................................................8

Sheila Jasanoff, *The Fifth Branch: Science Advisers as Policymakers* 1 (1990) ...............7

*The Political Activity of Think Tanks: The Case for Mandatory Contributor
　　Disclosure*, 115 Harv. L. Rev. 1502 (2002).................................................10

U.S. Gov't Accountability Office, Rep. No. 19-280, *EPA Advisory Committees:
　　Improvements Needed for the Member Appointment Process* (July 2019),
　　https://www.gao.gov/assets/710/700171.pdf .............................................2

U.S. Gov't Accountability Office, Rep. No. 19-681T, *EPA Advisory Committees:
　　Improvements Needed for the Member Appointment Process* (July 2019),
　　https://www.gao.gov/assets/710/700299.pdf .............................................9

Union of Concerned Scientists, *Abandoning Science Advice* 5-6 (2018)
　　https://www.ucsusa.org/sites/default/files/attach/2018/01/abandoning-science-
　　advice-full-report.pdf...................................................................................9

## <u>Regulations</u>

5 C.F.R. § 2635.402(a)–(b)...........................................................................................8

5 C.F.R. Part 2635......................................................................................................9

## I.  INTRODUCTION

The Environmental Protection Agency's advisory committees are critical to upholding its mission to protect human health and the environment. While some committees advise on policy, many of EPA's advisory committees provide robust peer review and specialized scientific expertise on a myriad of critical issues ranging from children's health to lab accreditation. Because of the high degree of expertise required, some of the country's best independent scientists from academia—including many from state university systems—have long staffed EPA's advisory committees.

Current EPA leadership, however, is engaged in an attack on independent science. In October 2017, then-Administrator Scott Pruitt issued the directive at issue in this case, "Strengthening and Improving Membership on EPA Advisory Committees" (the Directive), which effectively bars EPA grant recipients from serving on EPA advisory committees. Pruitt commanded existing members to either abandon EPA-funded research projects—sometimes years in the making—or relinquish their advisory committee posts. Because EPA is one of the largest sources of funding for independent scientific research, the impact on committee makeup was immediate. From 2017 to 2018, the number of independent academic scientists on EPA's critical Science Advisory Board plummeted by forty percent. Dozens of other independent scientists and experts were removed from their advisory committee positions. Meanwhile, industry-funded representation *tripled*.[1]

---

[1] Furthermore, as the Government Accountability Office found in a report issued earlier this year, EPA failed to follow the proper procedures in appointing new members to two of the agency's most important advisory boards, further undermining the integrity of the process. *See* U.S. Gov't Accountability Office, Rep. No. 19-280, *EPA Advisory Committees: Improvements Needed for the Member Appointment Process* (July 2019), https://www.gao.gov/assets/710/700171.pdf.

The Directive should be invalidated. The EPA Administrator's discretion to appoint advisory committee members is not absolute. As Plaintiff points out, numerous sources of law provide binding standards that govern and bar EPA's Directive. For example, the failure to comply with the Federal Advisory Committee Act's (FACA) provisions on committee appointments has been viewed as a "gaping hole in government accountability" that is actionable. *W. Org. of Res. Councils v. David Bernhardt*, No. CV 18-139-M-DWM, 2019 WL 3805125, at *3, *6 (D. Mont. Aug. 13, 2019) (finding that Department of Interior's failure to provide "rational basis" for selecting membership rendered committee composition arbitrary and capricious—and therefore invalid—under FACA). Thus, this Court should reject EPA's claim that the Court is powerless to review the Directive.

Turning to the merits, this Court should grant Plaintiff's cross-motion for summary judgment. By tilting the make-up of EPA's advisory committees toward regulated industries, the Directive violates FACA's core command that agencies prevent special interest groups from using advisory committees as a vehicle to promote their own vested interests. As Plaintiff points out, the Directive also violates statutes that govern EPA's appointments to key advisory committees, EPA's own policies and guidelines on committee membership, and federal ethics regulations. Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss and in Supp. of Pl.'s Cross-Mot. For Summ. J. (hereinafter Pl.'s Mem.) at 14-22. Moreover, the Directive is arbitrary and capricious in violation of the Administrative Procedure Act (APA). In adopting the Directive, EPA failed to identify any actual conflicts of interest among grant recipients or acknowledge its own history of asserting that the receipt of grants does not disqualify individuals from advisory committee service. *See* Pl.'s Mem. at 23. In fact, aside from its own bald assertion, EPA points to no evidence whatsoever that the receipt of grants biases advisory committee recipients. As Plaintiff

argues, "this *ipse dixit* approach to decision-making does not satisfy the [APA]." Pl.'s Mem. at 29 (citing *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196 (D.C. Cir. 2000)).

But in addition to being illegal, the Directive is also dangerous to human health and the environment. As a result, the states of Washington California, Connecticut, Maryland, New Jersey, New York, Oregon, Pennsylvania, the Commonwealth of Massachusetts, and the District of Columbia (Amici States) write separately to highlight how the Directive weakens EPA's ability to perform rigorous science when making critically important decisions and has significant, negative impacts on EPA's ability to carry out its core mission—all to the detriment of states, state universities, regulated entities, and the American people.

## II.     IDENTITY AND INTEREST OF AMICI CURIAE

Amici States submit this brief as amici curiae in support of Plaintiff and its claim that then-Administrator Pruitt acted unlawfully and arbitrarily when he issued the Directive generally banning recipients of EPA grant funds from serving on EPA's advisory committees or their respective sub-committees.

The Directive will injure Amici States in at least four respects. First, the likely diminished quality of EPA regulatory standards and EPA-funded research will harm the states' citizens and natural resources and, thus, Amici States' quasi-sovereign interest "in the health and well-being— both physical and economic—of [their] residents . . . ." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

Second, Amici States have regulatory programs, including authorizations to implement aspects of federal environmental statutes that will be affected by the Directive. Excluding many top scientists with the best understanding of complex environmental issues diminishes the competence of the advisory committees created to ensure that EPA's policies and regulatory proposals are based on the best available science. This handicaps EPA's ability to perform its core

functions and, in turn, harms the Amici States by placing additional burdens on the states to fill EPA's resulting regulatory gaps.

Third, EPA's failure to apply quality science to its regulatory agenda subjects Amici States, and regulated entities within Amici States' borders, to ineffective and inefficient regulatory standards. As with private parties, states engage in a wide range of proprietary functions subject to regulation under federal standards. Amici States have an interest—undermined by the Directive—in being subject only to regulations that are premised on rigorous science.

And, fourth, the Directive directly harms Amici States' respective university systems. Flagship state universities are among the Nation's premier research institutions and, as such, are significant recipients of EPA grant funds. For example, Washington State universities have received approximately $78 million in EPA research funding over the past ten years alone.[2] Not only is the research conducted invaluable to society in general—and the United States' standing globally as a leader in environmental and public health science—but EPA grants also support development of our country's scientific talent, helping recipient universities attract and retain world-class faculty and recruit top students to research programs. Although the Directive exempts employees of state agencies, faculty at state universities are subject to the Directive and have either been removed from service on EPA advisory committees or have been compelled to relinquish their grants or forego grant opportunities. And countless others will be forced to make that arbitrary and harmful choice going forward to the great detriment of state universities.

---

[2] *See* EPA Online Grants Database,
https://yosemite.epa.gov/oarm/igms_egf.nsf/AllGrantsNarrow?SearchView&Query=(FIELD%22Applicant_Type%22=%22State+Institution+of+Higher+Learning%22)AND(FIELD%22Applicant_State%22=%22WA%22)&Search Order=1&SearchMax=1000&SearchWV=false&SearchFuzzy=false&Start=1&Count=500 (last accessed on July 30, 2019).

By forcing current and potential future advisory committee members to choose between funding for their research and service on advisory committees, the Directive weakens the very bodies necessary to ensure EPA's work is scientifically robust. That result directly harms the Amici States' ability to protect human health and the environment within their respective jurisdictions and to attract top talent to state universities.

## III.   ARGUMENT

### A.   The Directive Excludes Independent Voices Contributing to EPA Science Based on Non-Existent Conflicts of Interest

EPA's ability to implement the Nation's environmental laws is highly dependent on top-level scientific expertise. As described by former EPA Deputy Director Robert Sussman, "EPA sets allowable ambient levels for our major air pollutants . . . regulates the releases of toxic chemicals from industrial facilities of all types, sets emission standards for cars and trucks, determines permissible levels of contaminants in drinking water, and sets health-based cleanup standards for contaminated sites."[3] EPA also "implements a regulatory regime that determines what active ingredients can be used in pesticides . . . reviews all new chemicals before they are introduced into commerce [and] . . . sets safe exposure levels for widely known and distributed environmental toxins like lead, asbestos, and radon in homes and schools."[4] Perhaps more so than any other federal agency, the success of EPA's mission depends on the rigorous application of science.

EPA's advisory committees have helped ensure that the scientific underpinnings of EPA's work employ the best available research and data. By serving as independent voices informing EPA's technical determinations, advisory committees curb the influence of financial and political

---

[3] Robert M. Sussman, *Science and EPA Decision-Making*, 12 J.L. & Pol'y 573, 578 (2004).
[4] *Id.*

pressures on EPA's application of relevant scientific evidence and "interject a much needed strain of competence and critical intelligence into a regulatory system that otherwise seems all too vulnerable to the demands of politics."[5]

In light of these critical functions, EPA's decision to disqualify scientists who receive EPA funding from serving in these positions is deeply troubling. EPA has long depended upon assistance from academic scientists and medical professionals performing cutting-edge work at universities, hospitals, or non-profits. *See* Compl. ¶ 27. And, because Congress directs EPA to spend a significant portion of its budget on grants, EPA is one of the primary sources of this public funding. As a result, the Directive applies disproportionately to independent, public-interest researchers rather than those who receive industry funding. Many of those excluded by the rule are leading experts in their respective fields "[b]ecause the leading experts on topics of concern to the EPA are those most likely to obtain highly competitive federal grants…."[6] As a result, "the rule prevents the EPA from getting input from some of the most knowledgeable voices in the field."[7]

Indeed, the Directive has already resulted in the removal of scores of highly qualified scientists—including top state university scientists—from advisory committee roles (and will prevent countless others from serving in the future). For example, the Directive resulted in the removals of prominent scholars from service on the Clean Air Scientific Advisory Committee's subcommittee on national ambient air quality standards for particulate matter pollution. In March 2018, Dr. Peter Adams, a Professor of chemical engineering at Carnegie Mellon University, was

---

[5] Sheila Jasanoff, *The Fifth Branch: Science Advisers as Policymakers* 1 (1990).
[6] Preet Bharara, Christine Todd Whitman, *Proposals for Reform Volume II: National Task Force on Rule of Law & Democracy* 34 (Oct. 3, 2019), https://www.brennancenter.org/sites/default/files/2019-09/2019_10_TaskForce%20II_0.pdf.
[7] *Id.*

forced by EPA to either relinquish his grant or resign his committee appointment as a result of the Directive. Decl. of Peter Adams ¶ 14. Dr. Adams reluctantly stepped down from the committee. *Id*. ¶ 15. Similarly, Dr. Joel Kaufman, a Professor at the University of Washington and a board-certified physician and epidemiologist, was forced to resign from EPA's Particulate Matter Review Panel in 2018.[8] Decl. of Joel Kaufman ¶ 13. EPA's exclusion of these and others of the nation's most capable environmental and public health scientists hobbles the agency's ability to execute its core mission.

Worse still, the Directive arbitrarily sacrifices the critical knowledge and insight of these researchers while delivering *nothing* of value in return. The Directive identifies no instances of actual conflicts arising from academic advisory committee members' receipt of EPA grants, provides no evidence that the receipt of EPA grants would lead to a lack of independence, and fails to explain how existing mechanisms for preventing conflicts are insufficient. *See* Compl. ¶ 37; Ex. B. In fact, committee members already must disclose any potential biases prior to service. Compl. ¶ 44. And existing ethics requirements applicable to advisory committee members already prohibit participation on matters that would directly implicate the financial interests of committee members, including any EPA grants. *See* 5 C.F.R. § 2635.402(a)–(b). By disqualifying individuals from serving on any EPA advisory committee—no matter how tenuously related to any EPA grants they may have received—the Directive creates out of whole cloth a new, arbitrary conflict-of-

---

[8] In another troubling aspect of EPA's current hostility to independent, health-protective science within the agency, Administrator Wheeler disbanded the Particulate Matter Review Panel altogether, ending their critical look into the adequacy of standards for one of the most hazardous types of air pollution. Sean Reilly, *EPA scraps science panel: 'Your service ... has concluded'*, E&E News (Oct. 12, 2018), https://www.eenews.net/stories/1060102455. That task has now fallen to the seven-member Clean Air Scientific Advisory Committee (the CASAC), which was completely re-constituted in the wake of the Directive. Where the particulate matter review process once included input from at least seven prominent epidemiologists, CASAC is now staffed by a statistician funded by industry groups opposed to particulate matter regulation and several state regulators with a history of downplaying the effects of air pollution. Scott Waldman, *Science adviser allowed oil group to edit research*, Climatewire, (Dec. 10, 2018), https://www.eenews.net/climatewire/stories/1060109129.

interest policy that is inconsistent with decades of executive branch ethics policy and a pre-existing command that agencies receive U.S. Office of Government Ethics approval for supplemental ethics regulations. *See generally* 5 C.F.R. Part 2635.

Far from advancing EPA's alleged goal of reducing conflicts of interest and bolstering committees' independence, the Directive in fact accomplishes the exact opposite, resulting in real harm to Amici States. The Directive has increased the presence of lobbyists and industry representatives with a vested interest in seeing that EPA policy favors their employers' and sponsors' industries.[9] For example, a recent study found that, after adoption of the Directive, independent academic membership on EPA's Science Advisory Board fell by forty percent while the number of industry representatives tripled.[10] The study also found troubling decreases in both the number of federal science advisory committee meetings and the overall number of committee members.[11] Additionally, as recently detailed in a United States Government Accountability Office report, EPA is failing to follow its own procedures in both documenting the rationale for proposed advisory committee members and vetting their potential conflicts of interest.[12]

That shift toward industry-funded scientists has serious implications for EPA's work because industry research has been repeatedly shown to favor weaker regulations on the sponsoring industry.[13] In one large-scale comparative analysis of industry-funded studies related

---

[9] Liza Gross, Lindsey Konkel, Elizabeth Grossman, *EPA Swaps Top Science Advisers With Industry Allies*, Reveal (Nov. 17, 2017), http://www.revealnews.org/article/epa-swaps-top-science-advisers-with-industry-allies/; *see also* Emily Holden, Anthony Adragna, *Major Trump Donor Helped Pruitt Pick EPA Science Advisors*, Politico (June 8, 2018), https://www.politico.com/story/2018/06/08/doug-deason-trump-donor-helped-pruitt-pick-epa-science-advisers-603450.

[10] *See* Union of Concerned Scientists, *Abandoning Science Advice* 5-6 (2018) https://www.ucsusa.org/sites/default/files/attach/2018/01/abandoning-science-advice-full-report.pdf.

[11] *Id*.

[12] *See* U.S. Gov't Accountability Office, Rep. No. 19-681T, *EPA Advisory Committees: Improvements Needed for the Member Appointment Process* (July 2019), https://www.gao.gov/assets/710/700299.pdf.

[13] *See* Besley, et al., *Perceived Conflict of Interest In Health Science Partnerships*, Plos (Apr. 20, 2017) http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0175643.

to chemical safety, researchers concluded that while sixty percent of non-industry-funded studies found harm in a suite of chemicals, only twenty-six percent of studies funded by the chemical industry found harm in the same chemicals.[14] Another review found that industry-funded medical studies were eight times less likely to show results unfavorable to the sponsoring industry.[15]

And that is no surprise, as certain industries also have a long and well-documented history of purposefully skewing scientific studies to further their agendas. Most famously, the tobacco industry spent decades and billions of dollars funding now-debunked science to counter ever-increasing evidence that smoking is harmful. *See United States v. Phillip Morris USA, Inc.*, 449 F. Supp. 2d 1, 723 (D.D.C. 2006) ("Defendants took steps to undermine independent research, to fund research designed and controlled to generate industry-favorable results, and to suppress adverse research results.").[16] More recently, a group of professors at Tennessee Tech denounced an industry-funded study of "glider" truck emissions that "[read] more like an advertisement" and contradicted earlier studies showing that such emissions were much more harmful to human health than emissions from trucks with modern emission controls. Adam Tamburin & Jason Gonzales, *Tennessee Tech Professors 'Begging' Leaders to Disavow Contested Emissions Research*, Tennessean (Feb. 19, 2018).[17] The study, paid for by a glider truck manufacturer, has been disavowed by the institution that issued it and is now the subject of an internal investigation, and EPA has since abandoned a regulatory rollback premised on the disputed study.[18] Replacing an

---

[14] *The Political Activity of Think Tanks: The Case for Mandatory Contributor Disclosure*, 115 Harv. L. Rev. 1502 (2002).

[15] Joanna K. Sax, J.D., Ph.D., *Protecting Scientific Integrity: The Commercial Speech Doctrine Applied to Industry Publications*, 37 Am. J.L. & Med. 203, 206 (2011).

[16] *See also* Elisa Tong, Stanton Glantz, *Tobacco Industry Efforts Undermining Evidence Linking Secondhand Smoke With Cardiovascular Disease*, Circulation, Vol. 116, Issue 16, Oct. 16, 2007. http://circ.ahajournals.org/content/116/16/1845.full.pdf?download=true.

[17] *See*         https://www.tennessean.com/story/news/politics/2018/02/16/tennessee-tech-professors-begging-leaders-disavow-contested-emissions-research/345773002/.

[18] *Id*.

entire category of academic scientists with industry scientists means that EPA's capacity to identify and appropriately counteract environmental harms will be stunted and—in a very real sense for those most vulnerable to environmental harms—more lives may be harmed.[19]

## B.    The Directive Results in Concrete Harms to EPA's Mission and the Entities and Individuals Regulated By, or Reliant Upon, EPA's Work

Throughout its history, EPA's "greatest successes have occurred when policies, regulations, and decisions are based on the results of sound and relevant scientific research" with "the credibility of [those] decisions depend[ing] on the science underlying them."[20] As noted, EPA's use of extensive peer review, provided by independent scientists traditionally chosen solely "for their expertise and their scientific accomplishments," is one of the primary means by which EPA rigorously applies science.[21] The Directive's shift away from employing the most qualified and independent participants and toward industry-funded scientists to perform that review will have detrimental impacts on EPA's scientific and technical work and will undermine its core mission.

First, when EPA is wrong on the science, individuals—including especially vulnerable populations such as children and the elderly—can be exposed to dangerous levels of pollutants, cleanup levels for hazardous waste can be set above what is necessary to prevent long-term harms, critical habitat can be degraded, and water and air quality can be damaged, among other harms. For regulated parties, EPA mistakes can also result in inefficient expenditures to comply with regulations that fail to solve the problems they purport to address or that are later struck down. As

---

[19] Of critical import to this case, taking steps to pack advisory committees with industry insiders, without showing any rational basis for that decision, is arbitrary and capricious. *Bernhardt*, 2019 WL 3805125 at *6-7 (*citing Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016)).

[20] EPA Administrator Christine Todd Whitman, Remarks at the EPA Science Forum (May 1, 2002), https://archive.epa.gov/epapages/newsroom_archive/speeches/7f46885c3547108e8525701a0052e439.html

[21] Sussman, 12 J.L. & Pol'y at 580–81.

the glider truck example demonstrates, these harms will follow from the pointed shift toward industry-funded scientists resulting from implementation of the Directive.

Second, the Directive damages EPA's institutional legitimacy and capacity for effective and efficient governance. Advisory committee review is a "scientific seal of approval" that helps deflect criticisms from "adversaries within the EPA, from industry and environmental groups, or from the Office of Management and Budget."[22] That review also helps root out technical missteps before EPA makes final decisions on matters with broad impacts on both regulated industry and the environment and ensures EPA's work is defensible once finalized.

Indeed, over the years, courts have repeatedly pointed to EPA's use of advisory committee peer review in upholding EPA actions, preventing the need for EPA to re-do costly regulatory work.[23] *See, e.g., City of Portland v. EPA*, 507 F.3d 706, 716 (D.C. Cir. 2007) (upholding drinking water standard based on EPA's use of "best available, peer-reviewed science" developed by Science Advisory Board); *Ohio Valley Envtl. Coal. v. Fola Coal Co.,* 120 F. Supp. 3d 509, 523 n.16 (S.D. W.V. 2015) (upholding EPA's assignment of benchmark discharge levels and noting that "not only are there epidemiologists on the Science Advisory Board, there are some very fine epidemiologists serving in that capacity"); *United States v. Vertac Chem. Corp.*, 33 F. Supp. 2d 769, 778 (E.D. Ark. 1998), *rev'd on other grounds by United States v. Hercules, Inc.*, 247 F.3d 706 (8th Cir. 2001) (upholding EPA's cleanup level calculations at Superfund site based in part on review by Science Advisory Board). Degrading the quality and diversity of advisory committee

---

[22] Lars Noah, *Scientific "Republicanism": Expert Peer Review and the Quest for Regulatory Deliberation*, 49 Emory L.J. 1033, 1051 (2000).

[23] Conversely, EPA ignores the recommendations of its advisory committees at its peril. For example, the Second Circuit recently overturned EPA's Vessel General Permit under the Clean Water Act after EPA failed to follow the Science Advisory Board's report identifying ballast-water treatment systems. *Natural Res. Def. Council v. EPA*, 808 F.3d 556, 573 (2d Cir. 2015). And, in 2009 the D.C. Circuit held that EPA's decision not to strengthen the particulate matter ambient air quality standards was unlawful and, in doing so, noted EPA's failure to follow the recommendations of the CASAC. *Am. Farm Bur. Fed'n v. EPA*, 559 F.3d 512, 521 (D.C. Cir. 2009).

participants will undoubtedly mean fewer mistakes are caught and corrected before they are litigated.

Third, restricting the composition of advisory committees risks significant damage to the credibility and deference that committee work and EPA decisions based on that work have traditionally received. As described above, industries have a long and well-documented history of pushing questionable science to further industry objectives. For good reason, that history justifies skepticism of industry research. Thus, when EPA frontloads its science advisory committees with industry-funded scientists, EPA risks losing the credibility that those committees have built up over the decades—in both the courts and the court of public opinion. In short, the Directive will work irreversible damage to EPA's mission and institutional legitimacy.

## IV.    CONCLUSION

As set out in Plaintiff's Motion for Summary Judgment, the advisory committee Directive is arbitrary, capricious, and contrary to law. The Directive is also anathema to EPA's mission and the very purposes for which advisory committees were created, to the great detriment of the public in general and Amici States in particular. On those bases, and for the reasons set out above, this Court should grant Plaintiff's Motion and deny Defendant's Motion to Dismiss.

DATED this 17th day of October, 2019.

ROBERT W. FERGUSON
Attorney General of Washington

/s/ Kelly T. Wood
Kelly T. Wood (*Pro Hac Vice* pending)
Assistant Attorney General
Washington Attorney General's Office
Counsel for Environmental Protection
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104
(206) 326-5493
Email: kelly.wood@atg.wa.gov

ADDITIONAL COUNSEL:

For the STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General
EDWARD H. OCHOA
Supervising Deputy Attorney General
James R. Potter
Deputy Attorney General
Office of the Attorney General
Environment Section
300 South Spring Street
Los Angeles, CA 90013
Tel: (213) 269-6326
Email: James.Potter@doj.ca.gov

For the STATE OF CONNECTICUT

WILLIAM TONG
Attorney General
State of Connecticut
P.O. Box 120, 55 Elm Street
Hartford, CT 06141-0120

For the STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland
Joshua M. Segal
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
Tel: (410) 576-6300

For the STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General of New Jersey
LISA MORELLI
Deputy Attorney General
Department of Law and Public Safety
Division of Law
R.J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625-093
Tel: (609) 376-2708
Email: lisa.morelli@law.njoag.gov

For the STATE OF NEW YORK

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
Solicitor General
STEVEN C. WU
Deputy Solicitor General
MICHAEL J. MYERS
Senior Counsel
Environmental Protection Bureau
New York State Office of Attorney General
The Capitol
Albany, NY 12224

Tel. (518) 776-2382
michael.myers@ag.ny.gov



For the STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General of Oregon
PAUL GARRAHAN
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street, N.E.
Salem, Oregon 97301-4096
Tel: (503) 947-4593
Email: paul.garrahan@doj.state.or.us



For the STATE OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania
Strawberry Square
Harrisburg, PA 17120



For the COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General
CHRISTOPHE COURCHESNE
Assistant Attorney General and Chief
TURNER SMITH
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2200

Email: turner.smith@state.ma.us


For the DISTRICT OF COLUMBIA

Karl A. Racine
Attorney General for the District of Columbia
441 4th Street, NW, Suite 630
Washington, D.C. 20001

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2019, I electronically filed a true and correct copy of the foregoing Amici Curiae brief with the Clerk of the United States District Court for the Southern District of New York by using the CM/ECF system, which will send notification of such filing to all registered users of the CM/ECF system.

Dated this 17th day of October 2019.

/s/ Renae Smith
Renae Smith
Paralegal