UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
NATURAL RESOURCES DEFENSE COUNCIL,     :
INC.,                                  :
                                       :          19cv5174 (DLC)
                          Plaintiff,   :
                                       :          OPINION AND ORDER
              -v-                      :
                                       :
U.S. ENVIRONMENTAL PROTECTION AGENCY   :
and                                    :
ANDREW WHEELER, in his official        :
capacity as Administrator of the       :
Environmental Protection Agency,       :
                                       :
                          Defendants.  :
                                       :
-------------------------------------- X

APPEARANCES

For plaintiff:
Vivian H.W. Wang
Natural Resources Defense Council
40 West 20th St., Fl. 11
New York, NY 10011
(212) 727-4477

Thomas Zimpleman
Natural Resources Defense Council
1125 15th St. N.W., Suite 300
Washington, D.C. 20005
(202) 513-6244

For defendants:
Tomoko Onozawa
U.S. Attorney's Office S.D.N.Y.
86 Chambers St., Fl. 3
New York, NY 10007
(212) 637-2721

DENISE COTE, District Judge:

This action concerns a directive of the U.S. Environmental Protection Agency (the "EPA") providing, in part, that "no member of an EPA federal advisory committee be currently in receipt of EPA grants" (hereinafter the "Directive"). On June 3, 2019, the Natural Resources Defense Council, Inc. ("NRDC") filed this action, which primarily alleges that the Directive is arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), and was issued without complying with the APA's notice and comment requirements. The EPA has moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., or in the alternative, for summary judgment.[1] The NRDC has cross-moved for summary judgment. For the following reasons, the NRDC's motion for summary judgment is granted.

---

[1] By Order of October 16, 2019, the Court permitted non-parties Lynn R. Goldman, Bernard Goldstein, David Michaels, Kenneth Olden, Bob Perciasepe, and Terry Yosie to file an amicus brief as former officials of the EPA and federal agencies arguing that the Directive would prevent the EPA from employing the best available scientists on its advisory committees. By Order of October 18, the Court permitted non-party states, Washington, California, Connecticut, Maryland, New Jersey, New York, Oregon, Pennsylvania, Massachusetts, and the District of Columbia, to file an amicus brief arguing that the Directive impermissibly tilts the make-up of EPA advisory committees toward regulated industries and away from independent scientists.

**Background**

The following facts are taken from the administrative record and the parties' submissions.

I. Federal Advisory Committees

To aid its decision-making in core areas of human health and environmental protection, the EPA uses twenty-two federal advisory committees that provide guidance on a range of environmental and health issues. Federal advisory committees may be established by statute, the President, or federal agency heads; eight of the EPA's twenty-two federal advisory committees were created by statute. U.S.C. App. II § 5(c).

A. Statutory and Regulatory Framework

The Federal Advisory Committee Act of 1972 ("FACA") governs the establishment, management, oversight, and operation of federal advisory committees. See 5 U.S.C. App. II §§ 1 et seq. The General Services Administration ("GSA") is the agency tasked with prescribing regulatory guidelines for federal advisory committees, including ethics requirements. 5 U.S.C. App. II § 7(c).

> FACA requires that, among other things, any legislation establishing, or authorizing the establishment of any advisory committee, . . . shall . . . (2) require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee; [and] (3) contain appropriate provisions to assure that the advice and

3

recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment.

5 U.S.C. App. II § 5(b)(2), (b)(3) (emphasis supplied). By regulation, the composition of an advisory committee depends on the following factors:

(i) The advisory committee's mission; (ii) The geographic, ethnic, social, economic, or scientific impact of the advisory committee's recommendations; (iii) The types of specific perspectives required, for example, such as those of consumers, technical experts, the public at-large, academia, business, or other sectors; (iv) The need to obtain divergent points of view on the issues before the advisory committee; and (v) The relevance of State, local, or tribal governments to the development of the advisory committee's recommendations.

41 C.F.R. § 102-3, Subpt. B, App. A. Additionally, the "advice and recommendations of the advisory committee" must "not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." 5 U.S.C. App. II § 5(b)(3). FACA's implementing regulations require that agency heads must "[d]evelop procedures" to this end. 41 C.F.R. § 102-3.105. The regulations also provide that "advisory committee members serve at the pleasure of," and "[m]embership terms are at the sole discretion of," the appointing authority, "[u]nless otherwise provided by statute, Presidential directive, or other establishment authority." 41 C.F.R § 102-3.130.

Agency heads are required to "[a]ssure that the interests and affiliations of advisory committee members are reviewed for conformance with applicable conflict of interest statutes, regulations issued by the U.S. Office of Government Ethics (OGE) including any supplemental agency requirements, and other Federal ethics rules."[2] 41 C.F.R. § 102-3.105(h). OGE regulations provide that an advisory committee member may not work on a "particular matter" that has a "direct and predictable effect" on a member's financial interest, while clarifying that a "particular matter" does not refer to "broad policy options that are directed to the interests of a large and diverse group of persons." 5 C.F.R. § 2635.402(a), (b)(3). Individuals who violate this regulation are subject to criminal and civil sanctions under 18 U.S.C. § 216. 18 U.S.C. § 208(a).

As noted, Congress has established eight of the federal advisory committees of the EPA. They are: the Clean Air Scientific Advisory Committee ("CASAC"), the Science Advisory Board ("SAB"), the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel ("FIFRA SAP"), the Hazardous Waste Electronic Manifest System Advisory Board ("e-

---

[2] OGE is an "executive agency" tasked with "interpreting rules and regulations . . . governing . . . the filing of financial statements" for current government officials. See 5 U.S.C. App. IV § 103(b), 401(a), 402(b)(3), 402(b)(6). OGE was established by the Ethics in Government Act of 1978.

Manifest Board"), the Human Studies Review Board ("HSRB"), the National Drinking Water Advisory Council ("NDWAC"), the National Environmental Education Advisory Council ("NEEAC"), and the Scientific Advisory Committee on Chemicals ("SACC").[3]

The statute establishing CASAC requires that the committee be "composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies." 42 U.S.C. § 7409(d)(2)(A). The statute establishing SAB provides that "each member of the Board shall be qualified by education, training, and experience to evaluate scientific and technical information on matters referred to the Board under this section." 42 U.S.C. § 4365(b). The statute establishing FIFRA SAP requires that the committee "consist of 7 members appointed by the [EPA] Administrator from a list of 12 nominees, 6 nominated by the National Institute of Health and 6 by the National Science Foundation," that are to be "selected on the basis of their professional qualifications to assess the effects of the impact of pesticides on health and the environment." 7 U.S.C. § 136w(d)(1). The statute establishing the e-Manifest Board

[3] See 42 U.S.C. § 7409(d)(2)(A)-(B) (CASAC); 42 U.S.C. § 4365(a)-(b) (SAC); 7 U.S.C. § 136w(d) (FIFRA SAP); 42 U.S.C. § 6939g(f) (e-Manifest Board); Dep't of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-54, § 201, 119 Stat. 531 (2005) (HSRB); 42 U.S.C. § 300j-5(a) (NDWAC); 20 U.S.C. § 5508(a)-(b) (NEEAC); and 15 U.S.C. § 2603(e) (SACC).

requires that the committee be composed of nine members, including: the Administrator or his designee; at least two individuals with "expertise in information technology[;]" at least three individuals with "experience in using or [who] represent users of the manifest system to track the transportation of hazardous waste under this subchapter (or an equivalent State program)[;]" and at least three individuals who are "State representative[s] responsible for processing those manifests." 42 U.S.C. § 6939g(f). The statute establishing the NDWAC requires that the committee "consist of fifteen members," five of whom "shall be appointed from the general public[;]" five of whom "shall be appointed from appropriate State and local agencies concerned with water hygiene and public water supply[;]" and five of whom "shall be appointed from representatives of private organizations or groups demonstrating an active interest in the field of water hygiene and public water supply, of which two such members shall be associated with small, rural public water systems." 42 U.S.C. § 300j-5(a). The statute establishing the NEEAC requires that the committee consist of eleven members, two of whom "represent primary and secondary education (one of whom shall be a classroom teacher);" two of whom "represent colleges and universities;" two of whom "represent not-for-profit organizations involved in environmental education;" two of whom "represent State

departments of education and natural resources;" two of whom "represent business and industry;" and one of whom "represent[s] senior Americans."  20 U.S.C. § 5508(b)(2).

B. <u>Membership Selection and Ethics Review</u>

Before the issuance of the Directive, receipt of an EPA grant did not disqualify a scientist from membership on an EPA advisory committee.  All prospective members of EPA federal advisory committees, however, were required to complete and submit financial disclosure forms, which were evaluated as part of the membership selection process.  EPA ethics officials also would review this information for compliance with federal ethics laws and regulations.  Once a candidate was appointed to an EPA federal advisory committee, the SAB Staff Office and agency ethics officials would review each individual activity in which the committee member engaged for possible conflicts of interest and the appearance of a lack of impartiality.

In accordance with OGE regulations prohibiting committee members from working on a "particular matter" that affected their financial interests, 41 U.S.C. § 102-3.105(h), committee members were forbidden from participating in matters that would affect a project for which they had received an EPA grant.  When committees considered specific research conducted by a member of the committee, the member would recuse him or herself or would

be recused by a designated federal officer.  Recusals were noted in public minutes for committee meetings.

II.  <u>EPA Grants</u>

The EPA funds and administers research grants to independent institutions in order to further the investigation of science it believes would benefit its mission of protecting human health and the environment.  For this purpose, the EPA also operates programs that make grants to state, local, and tribal governmental agencies.  To award grants, the EPA uses a competitive process that includes rigorous internal and external peer-review.

EPA grants are subject to guidance issued by the Office of Management and Budget ("OMB"), a division of the Executive Office of the President.  OMB has issued guidance to federal agencies providing that "when a scientist is awarded a government research grant through an investigator-initiated, peer-reviewed competition, there generally should be no question as to that scientist's ability to offer independent scientific advice to the agency on other projects."  Final Information Quality Bulletin for Peer Review, Fed. Reg. 2664, 2669 (Jan. 4, 2005).  This guidance is echoed in the EPA's Peer Review Handbook, which states

> [W]hen a scientist is awarded an EPA research grant
> through an investigator-initiated, peer-reviewed
> competition, there generally should be no question as

to that scientist's ability to offer independent
scientific advice to the [EPA] on other projects.
Those grantees are independent of [EPA] direction, and
can serve as peer reviewers for scientific or
technical work products (or portions thereof) that are
not solely a product of their own research conducted
under the [EPA] grant.

I.   The Directive

On October 31, 2017, then-EPA Administrator E. Scott Pruitt

issued the Directive, which is titled "Strengthening and

Improving Membership on EPA Federal Advisory Committees."  The

Directive announced four new principles for the EPA to apply in

selecting the membership of its advisory committees.  The

Directive states that these principles are intended to

"strengthen and improve the independence, diversity and breadth

of participation on EPA federal advisory committees."

The NRDC challenges the portion of the Directive that

purports to prohibit a class of EPA grant recipients from

serving on federal advisory committees.  That principle

provides:

Strengthen Member Independence:  Members shall be
independent from EPA, which shall include a
requirement that no member of an EPA federal advisory
committee be currently in receipt of EPA grants,
either as principal investigator or co-investigator,
or in a position that otherwise would reap substantial
direct benefit from an EPA grant.  This principle
shall not apply to state, tribal or local government
agency recipients of EPA grants.

The three remaining principles set forth in the Directive

announce the EPA's intention to increase participation in

10

federal advisory committees from state, tribal, and local government officials; to increase membership from historically unrepresented or underrepresented states and regions; and to regularly rotate membership. The Directive cautions that it is only "intended to improve the internal management of EPA and does not create a right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, EPA, its officers or employees, or any other person." It further provides that the EPA Administrator "reserve[s] the right to exercise [his] discretion to depart from the procedures set forth" therein.

To accompany the Directive, the EPA published a Memorandum that purports to explain the principles underlying the Directive (the "Memorandum"). Citing language in FACA, 5 U.S.C. App. II § 5(b)(2), the Memorandum affirms that all federal advisory committees "must be fairly balanced in terms of the points of view represented and functions to be performed by the committee." It then describes the Directive's principle to "Strengthen Member Independence," stating that "guaranteeing that [federal advisory committee] members remain independent" of the EPA is "vital" to "ensuring integrity and confidence" in these bodies. It provides, "EPA [federal advisory committees] should avoid financial entanglements with EPA to the greatest extent possible." It continues, "[n]on-governmental and non-

tribal members in direct receipt of EPA grants while serving on an EPA [federal advisory committee] can create the appearance or reality of potential interference with their ability to independently and objectively serve as a FAC member." "Accordingly," it concludes, "in addition to EPA's existing policies and legal requirements preventing conflicts of interest among the membership of" the EPA's federal advisory committees, "it shall be the policy of the [EPA] that no member of an EPA federal advisory committee currently receive EPA grants . . . ."

Following the issuance of the Directive, the EPA began removing from their posts committee members who were recipients of EPA grants.  This included members of the NRDC.  For example, NRDC member Peter Adams, Ph.D., a chemical engineer affiliated with Carnegie Mellon University, was contacted by the EPA in March 2018 while he was serving as a committee member on the CASAC Particulate Matter Review Panel.  Because Dr. Adams also then was a recipient of an EPA grant, he was required to step down from the advisory committee unless he agreed to discontinue receipt of his EPA grant.  After Dr. Adams advised that he preferred to continue with funding, the EPA terminated his service on the advisory committee.

II.  Procedural History

On June 3, 2019, the NRDC filed this action, which principally alleges that the Directive is arbitrary and

capricious pursuant to 5 U.S.C. § 706(2)(A), and that the EPA

failed to comply with the notice and comment requirements of 5

U.S.C. § 553.[4]  On August 23, the EPA moved to dismiss the

complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ.

P., or in the alternative, for summary judgment.  The NRDC

opposed the EPA's motions and cross-moved for summary judgment

on September 27.  The motions were fully submitted on November

27.

## Discussion

The EPA contends that this Court lacks subject matter

jurisdiction over this suit.  Both the EPA and NRDC contend

that, in any event, they are entitled to summary judgment on the

merits of the NRDC's APA claims.

"A suit brought in federal court is properly dismissed for

lack of subject matter jurisdiction under Rule 12(b)(1) when the

district court lacks the statutory or constitutional power to

adjudicate it."  Citizens for Responsibility and Ethics in Wash.

v. Trump, 939 F.3d 131, 142 (2d Cir. 2019) (citation omitted).

---

[4] The NRDC first challenged the Directive in a lawsuit filed on
January 24, 2018.  That case was dismissed for lack of standing.
Nat. Res. Def. Fund v. Wheeler, 367 F. Supp. 3d 219, 231-32
(S.D.N.Y. 2019).  The present action was filed in June 2019.
The NRDC has standing here based on the constitutional harm
sustained by its members.  See Friends of the Earth, Inc. v.
Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000) ("An
association has standing to bring suit on behalf of its members
when its members would otherwise have standing to sue in their
own right.").

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Fountain v. Karim, 838 F.3d 129, 134 (2d Cir. 2016) (citation omitted). A district court may consider evidence outside the pleadings when resolving a motion to dismiss for lack of subject matter jurisdiction. Broidy Capital Mgmt. LLC v. Benomar, 944 F.3d 436, 441 (2d Cir. 2019). "The party invoking federal jurisdiction bears the burden of establishing that jurisdiction exists." Sharkey v. Quarantillo, 541 F.3d 75, 82 (2d Cir. 2008) (citation omitted).

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering the evidence, the court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment even if contrary inferences might reasonably be drawn." Guertin v. United States, 743 F.3d 382, 385 (2d Cir. 2014) (citation omitted) (APA lawsuit). On cross-motions for summary judgment, the court must construe the evidence in each case in the light most favorable to the non-moving party. Friends of

Animals v. Romero, No. 18-24810-cv, 2020 WL 521850, at *4 (2d Cir. 2020).

I.   Subject Matter Jurisdiction

     The EPA first argues that there is no subject matter jurisdiction over this action since the Directive is not reviewable under the APA.  Under the APA, "[t]here is a strong presumption favoring judicial review of administrative action." Salazar v. King, 822 F.3d 61, 75 (2d Cir. 2016).  "In the absence of an express statutory prohibition, the agency bears the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of its decision."  Id. (citation omitted).  Review is not available, however, "to the extent that . . . agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  "This exception to the availability of judicial review applies only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Westchester v. U.S. Dep't of Housing and Urban Dev., 778 F.3d 412, 419 (2d Cir. 2015) (citation omitted).

     "To determine whether there is 'law to apply' that provides judicially manageable standards for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action."  Salazar, 822 F.3d at 76

(citation omitted).  "Agency regulations and guidance can provide a court with law to apply because, as the Supreme Court noted[,] where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.  This is so even where the internal procedures are possibly more rigorous than otherwise would be required."  Id. (citation omitted).  "Even when a regulation's adoption was not originally required by the statute, it can supply the law to apply."  Id.

The circuit courts are split as to whether judicially manageable standards are provided by FACA's requirements that advisory committees "be fairly balanced," 5 U.S.C. App. II § 505(b)(2), and that their "advice and recommendations" not be "inappropriately influenced by the appointing authority or by any special interest."  5 U.S.C. App. II § 505(b)(3).[5]  The Second Circuit has not addressed this question.

---

[5] See Cargill, Inc. v. United States, 173 F.3d 323, 335, 339 n.30 (5th Cir. 1999) (holding 5 U.S.C. App. II § 505(b)(2), (b)(3) justiciable); Ctr. for Policy Analysis on Trade and Health (CPATH) v. Office of the U.S. Trade Rep., 540 F.3d 940, 947 (9th Cir. 2008) ("narrow[ly]" holding that FACA's "fairly balanced" requirement is non-reviewable as applied to the Trade Act of 1974, while clarifying that "[i]t remains an open question in this circuit whether FACA's 'fairly balanced' requirement presents a reviewable controversy in other circumstances"); Colo. Envtl. Coal. v. Wenker, 353 F.3d 1221, 1232-33 (10th Cir. 2004) (holding that 5 U.S.C. App. II § 505(b)(3) is non-justiciable, while holding that regulation implementing id. § 505(b)(2) is justiciable); see also Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods ("Microbiological"), 886 F.2d 419, 430-31 (D.C. Cir. 1989) (panel divided on question of justiciability).

FACA provides manageable standards for judicial review of the Directive.  In so concluding, this Court incorporates the analysis set forth in <u>Natural Resources Defense Council v. Department of Interior</u>, 410 F. Supp. 3d 582, 603-08 (S.D.N.Y. 2019), ("<u>NRDC</u>"), an Opinion in which the Honorable Alison J. Nathan recently held that there are sufficient legal standards for a reviewing court to determine whether a federal advisory committee's composition complies with 5 U.S.C. App. II § 5(b)(2), (b)(3).  Judge Nathan's detailed analysis relied on the mandatory nature of the statutory text, which includes the statement that the entity establishing the advisory committee "shall . . . require" that its membership meet FACA's standards. <u>Id.</u> at 603.  She relied as well on Congress's purpose in enacting FACA, which included its desire to limit agency discretion in its creation and management of federal advisory committees.[6]  <u>Id.</u> at 604.  Finally, she relied on the existence of GSA regulations and relevant agency manuals, which provided further direction as to how a court shall apply § 5(b).[7]  <u>Id.</u> at

---

[6] Since Congress frequently creates federal advisory committees -- it has created eight for the EPA -- it is not surprising that Congress chose to impose standards regarding their creation and management.  Indeed, as described above, when creating committees, Congress often gives detailed directives for the composition of the committees and qualifications of the members.

[7] The regulations and agency manuals of particular relevance to the parties' dispute over the Directive are described above. Like the regulations and guidelines discussed in <u>NRDC</u>, the OGE

605-06.  This same analysis requires the conclusion that the EPA

has failed to carry its burden of showing that Congress

prohibited all "judicial review of the agency's compliance with

a legislative mandate."  <u>Mach Mining, LLC v. E.E.O.C.</u>, 575 U.S.

480, 487 (2015) (citation omitted).

In arguing to the contrary, the EPA principally relies on

two district court decisions concluding that the Directive is

non-justiciable for lack of judicially manageable standards from

FACA.  <u>See</u> <u>Physicians for Social Responsibility v. Wheeler</u>, 359

F. Supp. 3d 27, 43-47 (D.D.C. 2019); <u>Union of Concerned</u>

<u>Scientists v. Wheeler</u>, 377 F. Supp. 3d 34, 47-49 (D. Mass.

2019).[8]  Those decisions, which preceded Judge Nathan's decision

in <u>NRDC</u>, are not persuasive.  The EPA has therefore failed to

overcome the strong presumption that Congress did not mean to

prohibit all judicial review of the EPA's decisions regarding

the composition of its advisory committees.

---

regulations, OMB guidance and EPA's Peer Review Handbook also
contain concrete direction for judicial review.

[8] Both decisions rely on the reasoning set forth in the
concurring opinion of the Honorable Laurence H. Silberman in
<u>Microbiological</u>, finding that 5 U.S.C. App. II § 5(b)(2), (b)(3)
provide no meaningful standard of review.  886 F.2d at 430, 431
(Silberman, J., concurring).  In <u>Microbiological</u>, the Honorable
Harry T. Edwards concluded that the statute was justiciable,
while the Honorable Paul T. Friedman did not address
justiciability.

II.  Arbitrary and Capricious Review

The NRDC challenges the Directive as arbitrary and capricious because the EPA (1) failed to provide a reasoned explanation for its policy reversal, (2) issued the Directive in contravention of federal ethics laws, (3) did not articulate a rational connection between facts found and the choice it made, (4) failed to address the policy's impact on the balance of advisory committee membership, and (5) ignored the significant reliance interests of the individuals affected by the policy. The NRDC has carried its burden of showing that the Directive was issued in violation of the APA.

Under the APA, a reviewing court is to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2).  The agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citation omitted).  Agency action is arbitrary and capricious if the agency has

> relied on factors Congress has not intended it to
> consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of
> agency expertise.

<u>Nat. Res. Def. Council v. U.S. E.P.A.</u>, 658 F.3d 200, 215 (2d Cir. 2011) (citation omitted).

The scope of a reviewing court's inquiry is "narrow." <u>Dep't of Commerce v. New York</u>, 139 S. Ct. 2551, 2569 (2019) (citation omitted). A court may not substitute its judgment for that of the agency and "must confine" itself to ensuring that the agency "remained within the bounds of reasoned decisionmaking." <u>Id.</u> (citation omitted). Still, a court's "inquiry . . . is to be searching and careful." <u>Citizens to Pres. Overton Park v. Volpe</u>, 401 U.S. 402, 416 (1971). A court must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." <u>State Farm</u>, 463 U.S. at 43.

When reviewing agency action that represents a change to prior agency policy, a reviewing court generally applies this same standard. <u>See</u> <u>id</u>. "Agencies," of course, "are free to change their existing policies as long as they provide a reasoned explanation for the change." <u>Encino Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2125 (2016). But, "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." <u>Id.</u> at 2126 (citation omitted). "In explaining its changed position, an agency must also be cognizant that longstanding policies may

have engendered serious reliance interests that must be taken into account." Id. (citation omitted). "In such cases[,] . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." Id. (citation omitted). "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." Id. (citation omitted).

Applying these standards, the EPA's Directive is arbitrary and capricious. The EPA concedes, as it must, that the Directive is a departure from prior EPA policy that allowed EPA grant recipients to serve as members of advisory committees. Indeed, prior to the issuance of the Directive, the EPA's Peer Review Handbook stated specifically that there is "no question" that a scientist who receives EPA research funding can, nonetheless, offer "independent scientific advice" to the EPA. Thus, regardless of whether the EPA acted within its statutory grant of authority in adopting the policy choices set forth in the Directive, the EPA was required to provide a "reasoned explanation" for its decision to "disregard[] facts and circumstances that underlay or were engendered by the prior policy." Encino Motorcars, 136 S. Ct. at 2126 (citation omitted). The EPA has failed to do so.

The EPA did not articulate why an outright ban on EPA grant recipients would improve the existing policies that required demanding and continuous conflict of interest reviews, as well as publicly recorded recusals whenever an advisory committee considered research conducted by, or that would affect, a committee member. And while the EPA is correct that OGE regulations prohibiting members from advising on projects in which they are financially interested provide a floor, not a ceiling to the ethical requirements imposed on advisory committees, the EPA was required to explain why the prior policy was no longer deemed sufficient and the new policy was preferred.

The only explanation the EPA gave for the Directive is in its accompanying Memorandum, which devoted just half of one page to discussing the new policy. It states

> Ensuring [federal advisory committee] member independence strengthens the integrity, objectivity, and reliability of EPA [federal advisory committees]. Accordingly, in addition to EPA's existing policies and legal requirements preventing conflicts of interest among the membership of the [EPA's] [federal advisory committees] it shall be the policy of the [EPA] that no member of an EPA federal advisory committee currently receive EPA grants . . . .

This statement does not explain how the "facts and circumstances" that underlay the prior policy had changed, or why the EPA had chosen to disregard them in issuing the

Directive.  Encino Motorcars, 136 S. Ct. at 2126 (citation
omitted).

The administrative record produced by the EPA provides no
basis for finding that membership in an EPA advisory committee
by scientists who have received competitively awarded, peer-
reviewed EPA grants has caused bias in the work of those
committees.  For example, the EPA has cited no examples of grant
recipients providing biased recommendations in their service as
advisory committee members.

The EPA highlights an explanatory statement for the
Consolidated Appropriations Act of 2016 that directed the EPA
Administrator, for fiscal year 2016, to "develop a policy
statement on science quality and integrity that shall be adhered
to by the Science Advisory Board (SAB) and all Board members."
161 Cong. Rec. H10161, 10220 (2015).  The explanatory statement
directs that, "[s]hould the Administrator decide that financial-
related metrics are appropriate to identify conflicts-of-
interest bias," the EPA policy must evaluate "potential bias
based on a variety of factors including receipt of former and
current Federal grants or public statements or positions as well
as other appropriate safeguards to ensure balance amongst . . .
other advisory board experts."  Any such policy that the EPA
Administrator developed was required to be reviewed and approved
by the U.S. Government Accountability Office ("GAO").  The

Directive is not the policy described in the explanatory statement.  Among other things, the EPA has presented no evidence that the Directive was adopted in response to the explanatory statement, or that the Directive was reviewed or approved by the GAO.  The explanatory statement, therefore, does not fill the gap and provide a reasoned explanation for the EPA's change in policy.

The other evidence cited by the EPA fares no better.  It primarily consists of correspondence from members of Congress and regional interest groups expressing concern about the composition of certain advisory committees.  But, none of this correspondence articulates a belief that an actual or perceived conflict of interest may exist when an EPA grant recipient serves on an advisory committee.  Instead, the correspondence largely indicates a concern that EPA advisory committees lack geographic representation and fresh perspectives.  These concerns are addressed in the three other principles set forth in the Directive, which announce EPA's intention to increase participation in federal advisory committees from state, tribal, and local government officials; to increase membership from historically unrepresented or underrepresented states and regions; and to regularly rotate membership.  Those principles are not the subject of this litigation.  An agency must "articulate . . . a rational connection between the facts found

and the choice made." State Farm, 463 U.S. at 43 (citation omitted). Here, the EPA has failed to present any facts at all.

The EPA also failed to explain how the Directive would affect the balance of advisory committee membership. There is no evidence that the EPA considered what percentage of committee members received EPA grant funding. Nor is there evidence that the EPA took account of whether grant recipients had common qualifications or affiliations, or whether their elimination would require that committees be composed of members with uniform backgrounds and perspectives. This information would be crucial to the EPA's ability to ensure its compliance with FACA's fair balance requirement.

Finally, the EPA ignored the reliance interests of scientists who were both recipients of EPA grants and members of EPA advisory committees. The EPA made multi-year commitments to these individuals, then forced them to choose between the two. Committee members structured their research programs and professional commitments based on the prior EPA policy. This change of policy, therefore, undermined reliance interests and required greater explanation from the EPA.

The EPA's arguments to the contrary are not persuasive. First, the EPA argues that the Directive is a product of reasoned decision-making by new leadership at the EPA. After "years of the status quo and in light of public and

Congressional recommendations," the EPA argues, its leadership decided to take "steps to increase the independence and diversity of its committees." But, the Memorandum does not cite any of these purported public and Congressional recommendations. To the extent that the EPA implies that they are provided in their sparse cites to the administrative record, the record does not indicate that the Directive was issued in response to such concerns. The record also fails to provide any evidence that the EPA addressed these alleged concerns by engaging in any reasoned analysis or by reviewing any relevant data that might shed light on the matter.

The EPA also contends that it was not required to provide record evidence to support the Directive because it is not a legislative rule and is instead an exercise of the EPA's discretionary prerogative. As discussed below, it is true that the Directive is not formal agency action, and, thus, that the "substantial evidence" standard reserved for legislative rules does not apply. See Lincoln v. Vigil, 508 U.S. 182, 198 (1993) ("[T]he substantial-evidence test applies . . . only where agency action is taken pursuant to the rulemaking provisions of § 553." (citation omitted)). Nonetheless, the "focal point in arbitrary-and-capricious review is the administrative record," and that record must be reviewed under the arbitrary and capricious standard. Camp v. Pitts, 411 U.S. 138, 142 (1973)

(per curiam); Prairie State Generating Co. LLC v. Sec'y of
Labor, 792 F.3d 82, 93-94 (D.C. Cir. 2015) (same).  This
standard requires an agency to "examine the relevant data and
articulate a satisfactory explanation for its action."  State
Farm, 463 U.S. at 43.

Next, the EPA asserts that it adequately has explained its
reasons for adopting the Directive.  It contends that the
Memorandum "provides a detailed rationale" for the change.  It
does not.  The Memorandum states that the reason for the EPA's
new policy is to ensure committee member "independence" in order
to "strengthen[] the integrity, objectivity, and reliability" of
the EPA's advisory committees.  This brief statement does not
explain why the EPA determined that measures once deemed
sufficient to ensure advisory committee independence were no
longer considered adequate.  The Memorandum's "conclusory
statements do not suffice to explain" the EPA's decision.
Encino Motorcars, 136 S. Ct. at 2127.

Finally, the EPA argues that the GSA regulation providing
that advisory committee "[m]embership terms are at the sole
discretion of the appointing or inviting authority," 41 C.F.R. §
102-3.130(a), precludes a finding that scientists' reliance
interests were harmed by issuance of the Directive.  But, the
EPA exercised its authority by setting defined terms for its
committee members, rather than having them serve for undefined

periods of time on an at-will basis.  Committee members,
therefore, developed their research programs and made
professional commitments based on that understanding.

III.  Notice and Comment Rulemaking

The NRDC also argues that the EPA violated the APA by
issuing the Directive without first having undertaken notice and
comment rulemaking.  "The APA's notice-and-comment requirements
apply only to substantive, what are sometimes termed
legislative, rules . . . ."  Time Warner Cable Inc. v. F.C.C.,
729 F.3d 137, 168 (2d Cir. 2013) (citation omitted); see also 5
U.S.C. § 553(b).  The APA's notice-and-comment requirements do
not apply to "general statements of policy."  Lincoln, 508 U.S.
at 196 (citation omitted).  In determining whether an agency has
promulgated a substantive rule or, instead, issued a policy
statement, "the label that the particular agency puts upon its
given exercise of administrative power is not . . . conclusive;
rather it is what the agency does in fact."  Time Warner Cable,
729 F.3d at 168 (citation omitted).

"Substantive rules create new law, rights, or duties, in
what amounts to a legislative act."  Id. (citation omitted).
General statements of policy, by contrast, are "statements
issued by an agency to advise the public prospectively on the
manner in which the agency proposes to exercise a discretionary
power."  Lincoln, 508 U.S. at 197 (citation omitted).  As

28

explained by the D.C. Circuit, a "general statement of policy" refers to an "agency action that merely explains how the agency will enforce a statute or regulation -- in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule."  Nat. Mining Ass'n v. McCarthy, 758 F.3d 243, 252 (D.C. Cir. 2014).  "An agency policy statement does not seek to impose or elaborate or interpret a legal norm."  Synco Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997).  "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach," while "retain[ing] the discretion and the authority to change its position -- even abruptly -- in any specific case because a change in its policy does not affect the legal norm."  Id.

The Directive is a general statement of policy for which the EPA need not have undertaken notice and comment rulemaking. Although FACA's statutory criteria that advisory committees be "fairly balanced" and not "inappropriately influenced" are sufficiently delineated to make the Directive reviewable under the APA, "the generality of those standards underscores the administrative discretion inherent in the determination." Lincoln, 508 U.S. at 198.  The Directive explains that the EPA intends to enforce FACA's requirements that committees be "fairly balanced" and not "inappropriately influenced" by

prohibiting service from certain otherwise eligible individuals. This does not amount to a "legislative act" that creates new rights or duties.  <u>Time Warner Cable</u>, 729 F.3d at 168 (citation omitted).

The NRDC argues that the Directive required notice and comment rulemaking because it "force[d]" members off EPA advisory committees, thus changing their "existing rights and obligations."  But, a GSA regulation provides that "advisory committee members serve at the pleasure of," and that "[m]embership terms are at the sole discretion of[,] the appointing or inviting authority."  41 C.F.R. § 102-3.130(a). While this regulation does not erase individual reliance interests in committee membership for purposes of arbitrary and capricious review, it does mean that committee members do not have enforceable rights that were altered by the Directive.

IV.  <u>OGE Procedural Requirements</u>

Finally, the NRDC argues that the EPA failed to follow procedural requirements set forth in an OGE regulation governing agency regulations that supplement the uniform federal ethics rules.  Pursuant to 5 C.F.R. § 2635.105(a), an agency must "prepare and submit to the [OGE], for its concurrent and joint issuance, any [supplemental] agency regulations."  Only "[a]fter concurrence and co-signature by [OGE]," may the agency submit its supplemental regulations for publication and codification in

the Code of Federal Regulations.  Id. at § 2635.105(b).
Supplemental agency regulations "are effective only after
concurrence and co-signature by [OGE] and publication in the
Federal Register."  Id.

As the EPA points out, there is no private right of action
to enforce this regulation.  Under 5 C.F.R. § 2635.106(c), a
"violation of this part . . . does not create any right or
benefit, substantive or procedural, enforceable at law by any
other person against the United States, its agencies, its
officers, or any other person."  The NRDC has provided no basis
to find that it may bring a lawsuit to enforce § 2653.105(a).

## Conclusion

The EPA's August 23 motion to dismiss and for summary
judgment is denied.  The NRDC's September 27 cross-motion for
summary judgment is granted.


Dated:    New York, New York
          February 10, 2020

_____
DENISE COTE
United States District Judge
